UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| DONALD KIPNIS and LAWRENCE KIBLER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. |
| BAYERISCHE HYPO-UND VEREINSBANK, AG , a corporation, now known as UNICREDIT BANK AG; HVB U.S. FINANCE, INC., now known as UNICREDIT U.S. FINANCE, INC., | ) ) ) ) ) ) | |
| Defendants. | ) ) | **JURY DEMAND REQUESTED** |

## COMPLAINT

The named Plaintiffs above and each of their related entities ("Plaintiffs") bring this action

against Bayerische Hypo-Und Vereinsbank, AG and HVB U.S. Finance, Inc., and HVB Capital Markets

LLC (collectively, "HVB" or "Defendants").

## NATURE OF THE CASE

1.      This case is about Custom Adjustable Rate Debt Structure ("CARDS"), which is one of

a number of very sophisticated income tax shelter schemes that Defendant HVB, along with other co-

conspirators not named here, promoted and sold on a national and international level for their own

financial gain and to defraud the Plaintiffs and others.  These and similar activities have been a subject

of investigations by the Internal Revenue Service ("IRS"), the Department Of Justice ("DOJ"), and the

United States Senate, culminating in HVB entering a criminal plea agreement with the DOJ and IRS.

Consequently, this is an action for damages arising out of Defendants' violations of RICO, fraud, aiding

and abetting fraud, conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duty,

and negligent supervision.

<u>**PARTIES, JURISDICTION, AND VENUE**</u>

2.　　Plaintiff Donald Kipnis ("Kipnis") is an individual and, at all relevant times, has been a resident of Miami-Dade County, Florida.

3.　　Plaintiff Lawrence Kibler ("Kibler") is an individual and, at all relevant times, has been a resident of Miami-Dade County or Broward County, Florida.

4.　　Defendant Bayerische Hypo-Und Vereinsbank AG d/b/a HVB Group ("HVB Group") is a German corporation and one of the largest banks in the world with its principal place of business located in Munich, Germany.　It is involved in international banking and investment transactions, including transactions throughout the United States, including the Northern District of California.　It also purposefully directed its tax shelter activities complained of herein towards the plaintiffs in Florida.

5.　　Defendant HVB U.S. Finance, Inc., formerly known as HVB Structured Finance, Inc., is a corporation offering banking and credit services with its principal place of business located in New York, New York.　It is a United States affiliate of the HVB Group and handles banking and financial transactions throughout the U.S., including the Southern District of Florida.　It also purposefully directed its tax shelter activities complained of herein and otherwise established contacts with Florida in participating in the CARDS transactions, as described below.

6.　　Defendants' co-conspirators in the fraudulent scheme include, but are not limited to, the following: Sidley LLP, f/k/a Sidley Brown & Wood LLP, f/k/a Brown & Wood LLP ("Sidley"); Raymond J. Ruble ("Ruble"); Dewey & LeBoeuf LLP, f/k/a LeBoeuf, Lamb, Greene & MacRae LLP ("LeBoeuf"); Graham Taylor ("Taylor"); Sussex Financial Enterprises f/k/a Chenery Associates, Inc. ("Chenery"); and Roy Hahn ("Hahn") (including defendants, collectively, "CARDS Dealers").　My CFO, Inc. a/k/a STARS Holding Co., KPMG, CBIZ and Deutche Bank also participated in these and

2

related tax shelter programs and formed associations in fact with the CARDS Dealers to market and promote tax shelters in order to generate substantial fees.

7.     This Court has personal jurisdiction over Defendants because they purposefully availed themselves of the forum state of Florida by participating in the CARDS investment strategy that was marketed and sold to the Plaintiffs in Miami-Dade and Sarasota Counties in Florida. Defendants purposefully directed their activities to the Plaintiffs in Florida and the Plaintiffs' injuries arose out of those activities.

8.     Plaintiffs entered into CARDS transactions in reliance on the reputations of the CARDS Dealers involved in their transactions, the representations made by the CARDS Dealers about the lawfulness and legitimacy of the transaction and its potential for profit above and beyond tax savings. The Plaintiffs have since been audited by the IRS and disputed the IRS notice of deficiency.   On November 1, 2012, the United States Tax Court ruled against Plaintiffs Kibler and Kipnis.  The ruling requires that Plaintiffs pay substantial tax liability and interest.

9.     This Court also has personal jurisdiction over Defendants through "conspiracy personal jurisdiction" because Defendants, as alleged below, conspired to defraud Plaintiffs and one or more of said Defendants who conspired in said conspiracy are subject to this court's personal jurisdiction.

10.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) as a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTUAL BACKGROUND

### I.  SUMMARY OF HVB'S FRAUDULENT TAX SHELTER ACTIVITY

11.     As established in guilty pleas and criminal convictions, HVB and its employees, along with Sidley and Chenery, conspired to perpetrate a huge tax fraud on thousands of trusting clients, including each of the Plaintiffs.

12.     HVB pushed a supposed loophole in the tax code it knew would not withstand IRS scrutiny.  It did so for the sole purpose of enriching itself with unconscionable fees – in excess of $16 million to HVB alone, and without regard to the monetary and reputational damage their conduct would cause their clients.  By this action, Plaintiffs seek recovery for the out-of-pocket losses caused by HVB and its employees' criminal misconduct.

13.     HVB entered into a deferred prosecution agreement and agreed that "between 1996 and 2002 HVB participated in a number of fraudulent tax shelter transactions … including … Custom Adjustable Rate Debt Structure ("CARDS")" transactions.  HVB further admitted that Domenick Mario DeGiorgio, while an HVB Managing Director and Vice President, implemented a CARDS strategy in which "the documentation created and executed by HVB, falsely stated that the loans were 30-year loans whereas, in truth and fact … they were loans of approximately one year in duration." HVB further admitted to DeGiorgio's "false representations," admitted that they were "untrue," and that the transactions had "no purpose other than generating tax benefits…."

14.     In order to avoid criminal indictment, HVB agreed to pay the Government more than $29 million.  HVB signed a deferred prosecution agreement and admitted that it "assisted high net worth United States citizens to evade United States individual income taxes on over $1.8 billion in capital gain and ordinary income by participating in and implementing fraudulent tax shelter transactions, including … CARDS." *See* HVB Deferred-Prosecution Agreement ("DPA") attached as

4

Exhibit 1 at 2. HVB further admitted to having prepared and signed "false and fraudulent factual recitations, representations, and documents as part of the documentation underlying the shelters." *Id.*

15. In addition, HVB executive DeGiorgio waived indictment and pled guilty on August 11, 2005 to four counts of illegal conduct, including "participating in a conspiracy to defraud the Internal Revenue Service involving tax shelter transactions promoted by and participated in by [his] employer, Hypo-Und Vereinsbank, HVB, including the tax shelter known as BLIPS." *(United States v. DeGiorgio,* S.D.N.Y. 05-CR-853 BSJ). He also pled guilty to violating another federal conspiracy statute for "participation in a conspiracy to defraud the IRS involving the payment to various participants in tax shelter transactions of compensation that was obtained through and as a result of certain tax shelter transactions involving HVB and which compensation was not reported to the IRS by certain recipients and payors of the compensation."

16. Though they were quick to save their own skin, neither HVB nor DeGiorgio made any attempt to contact Plaintiffs, who had paid them substantial fees, to recommend that Plaintiffs also abandon the strategy and, as a result, Plaintiffs incurred hundreds of thousands of dollars in "clean-up" costs.

17. The transactions Plaintiffs executed with HVB were nothing more than illegal tax shelters, which were developed and implemented by Chenery and HVB for the sole purpose of generating unconscionable fees. In direct contravention of established rules, regulations and law governing tax shelters, the CARDS strategy involved the establishment of entities to engage in transactions that were economically worthless.

18. In the DPA Statement of Facts, HVB goes further in admitting institutional deficiencies: "HVB's supervisory and internal controls at the time failed to prevent and detect the improper and illegal conduct by DeGiorgio and HVB's involvement with the fraudulent tax shelter activity. Specifically, for example, HVB did not have proper policies and procedures for analyzing tax-

motivated transaction in which HVB was participating nor for involving the Tax Department in an appropriate analysis and approval process for such transactions." Ex. C to DPA at ¶ 4.

19.     Plaintiffs reasonably relied on the advice and actions of HVB, one of the most well respected banks in the world, its brokers, and the Sidley lawyers with whom HVB conspired. Despite the conspirator's representations, the CARDS strategy did not, in fact, withstand IRS scrutiny, nor by the admissions in the DPA could it ever have withstood IRS scrutiny.

20.     As a result, Plaintiffs have paid a heavy price in damages, including (1) excessive fees to participate in the strategy, (2) interest assessed by the IRS and state internal revenue agencies, and (3) significant clean-up costs to extricate themselves from the mess created by Deutsche Bank and its partners-in-crime.

## II.     THE TAX SHELTER INDUSTRY PERPETRATES FRAUDULENT SHELTERS

21.     During the late 1990s, the tax shelter industry experienced exponential growth as accounting firms and financial institutions sought to exploit weaknesses in the IRS enforcement capabilities.  Tax shelters developed and sold during the late 1990s and early 2000s included OPIS, the Bond Linked Issue Premium Structure (BLIPS), the Foreign Leveraged Investment Program (FLIP), the Bond and Option Sales Strategy (BOSS), the Contingent Deferred Swap (CDS), and the Custom Adjustable Rate Debt Structure (CARDS).  While the structure and mechanics of these transactions varied slightly, the undisclosed goal was always the same – to generate phony paper losses for taxpayers, using a series of complex, orchestrated transactions, structured finance, and investments with little or no profit potential.

22.     These schemes typically involved a financial institution (such as HVB) to fund the loans, law firms (such as Sidley) to issue favorable tax opinions on the proposed transactions and sometimes aid in designing the shelter, and an investment advisory firm (such as Chenery) who assisted in the design, development, and implementation of the tax shelters.

23.     Many of the promoters of these transactions have reached agreements with the government under which they agreed to pay millions of dollars to the IRS and or the DOJ in order to avoid prosecution, and a number of individuals have been indicted and convicted on criminal charges for their role in promoting these tax shelters.

24.     Numerous prestigious firms and banking institutions have been implicated in these schemes.  Those that have reached settlements and/or non-prosecution agreements with the IRS and the DOJ for their involvement, include: HVB, Deutsche Bank, Sidley, Jenkins & Gilchrist, KPMG, Ernst & Young, and PriceWaterhouseCoopers.  These firms and institutions relied on their high-quality reputations to convince potential investors that these schemes were legitimate.  Many promoters who entered into deferred prosecution agreements had to agree to behavioral covenants as a condition of the agreement, such as submitting to an independent monitor, and to pay hundreds of millions of dollars to the IRS and DOJ.

25.     Plaintiffs were induced to enter into CARDS transactions in reliance on the reputations of the CARDS Dealers involved in their transactions.

26.     Plaintiffs paid significant fees to the CARDS Dealers.  Each of the Plaintiffs has since been audited by the IRS.

27.     Plaintiffs have paid significant attorneys' and accountants' fees in defending themselves with the IRS and incurred significant economic loss by relying on the advice of trusted CARDS Dealers who had fiduciary duties to look out for the Plaintiffs' best financial interests.

## III.    HVB PARTICIPATES WITH CHENERY, SIDLEY AND OTHERS IN CREATING AND MARKETING FRAUDULENT CARDS TAX SHELTERS

### A.    The Senate Found that HVB Facilitated Abusive Tax Shelters

28.     HVB's abusive tax shelter activity, and the abuses of its co-conspirators and others, was the subject of a hearing before the United States Senate Committee on Finance and a subsequent report issued by the Senate's Permanent Subcommittee on Investigation titled "The Role Of Professional

Firms in the U.S. Tax Shelter Industry. The central focus of the Report was on the role of KPMG in the creation and marketing of abusive tax shelters, especially the BLIPS tax shelter, along with the cooperation and coordination between KPMG and HVB, and others.

29.     The Permanent Subcommittee on Investigations' findings included:

(1) The sale of potentially abusive and illegal tax shelters is a lucrative business in the United States and **some professional firms such as accounting firms, banks, law firms, and investment advisory firms have been major participants** in the development, mass marketing, and implementation of generic tax products sold to multiple clients.

* * *

(11) **Sidley Brown & Wood**, through its predecessor firm Brown & Wood, provided legal services that **facilitated the development and sale of potentially abusive or illegal tax shelters**, including by providing design assistance, collaboration on allegedly independent tax opinion letters, and hundreds of boilerplate tax opinion letters to clients referred by KPMG and others, in return for substantial fees.

* * *

(13) Deutsche Bank, **HVB Bank**, and UBS Bank provided **billions of dollars in lending** critical to transactions which the banks knew were tax motivated, involved little or no credit risk, **and facilitated potentially abusive or illegal tax shelters** known as FLIP, OPIS, and BLIPS.

30.     The Subcommittee concluded further that "**Leading banks, including** Deutsche Bank, **HVB**, and UBS, **provided multi-billion dollar credit lines essential to the orchestrated transactions.**" In particular, "HVB Bank participated in 29 BLIPS transactions in 1999 and 2000, providing BLIPS credit lines that totaled about $2.5 billion."

31.     The Subcommittee further concluded that the participating banks, knew that the purpose of the transactions was to generate tax losses, that the shelters were abusive, but the banks participated because of the vast profits for little credit risk:

Evidence obtained by the Subcommittee shows that **the banks knew they were participating in transactions whose primary purpose was to provide tax benefits to persons who had purchased tax products from KPMG.** Some of the documentation also makes it plain that the banks were aware that the tax products were potentially abusive and carried a risk to the reputation of any bank choosing to participate in it. In exchange for their active and knowing participation, the banks obtained lucrative fees. For example, Deutsche Bank obtained $44 million in bank fees from the BLIPS transactions, and $35 million from OPIS, for a grand total of $79 million. **HVB obtained over $5.45 million for**

8

the BLIPS transactions it completed in less than 3 months in 1999, and won approval of increased BLIPS transactions throughout 2000, "based on successful execution of previous transactions, low credit risk and excellent profitability."

32.     HVB and Sidley have reached agreements with the United States government regarding their roles in certain tax shelters.  In May 2007, Sidley entered into a closing agreement with the IRS, and reached an agreement with the DOJ under which it pledged cooperation and issued a public statement of responsibility.  In February 2006, HVB entered into a non-prosecution agreement with the DOJ, agreed to pay over $29 million, and HVB also agreed to considerable limitations on its future practices.

**B.     The CARDS Dealers Joined to Create and Market the CARDS Scheme**

33.     Chenery was formed in the early 1990s by Roy Hahn, a CPA who had previously worked for Arthur Young, Coopers & Lybrand, and then PriceWaterhouseCoopers.  Chenery was formed as a financial and tax services boutique.  In a deposition in *Sussex Financial Enterprises v. HVB*, No. C-08-4791, N. Dist. California, Hahn testified that he met Ruble of Sidley (then Brown & Wood) in 1989.  He and Ruble worked on a number of tax-related transactions together, often for the same client.  Hahn and Ruble worked together on closing at least one 357(c) financing transaction known as Zero Enhanced Note Structure ("ZENS"), the corporate predecessor to CARDS, in approximately 1996 or 1997.

34.     Ruble claimed a proprietary interest in CARDS, and as a result unbeknownst to Plaintiffs, Hahn entered into a License Agreement with Ruble.  Under the License Agreement, Hahn agreed to pay Ruble 20 percent of the gross fees paid to Chenery from CARDS; the payments were to be made to Ruble's Family Investment Statutory Trust ("FIST").  Hahn testified that the formula in the license agreement was not meant to be followed, and that in fact he and Ruble worked out the amount of royalties Ruble would receive without regards to the license agreement.  Hahn has admitted to paying $1,850,000 into Ruble's FIST as royalties for CARDS.

9

### 1.    *CARDS Was Designed to Create Tax Losses*

35.    Like the other tax shelters which proliferated in the 1996-2002 time period, CARDS was a method of creating a tax loss without an economic loss.  Under the CARDS scheme, Chenery would organize or cause to be organized a single purpose limited liability company ("LLC") in Delaware.  These LLCs were typically named after underground metro lines in London, England, and later after underground train stations.

36.    To avoid U.S. tax consequences, the LLCs needed to be owned by foreign citizens. Chenery employee/associate Larry Austin contacted a friend in the United Kingdom, a tax attorney named Mio Sylvester to coordinate the CARDS deals in the UK.  Because Sylvester had dual citizenship between the U.S. and the U.K., he could not be a member of the LLC and still achieve the desired tax benefits; however, Sylvester's wife, Elizabeth Sylvester, and Michael Sherry, also a tax attorney, were recruited to be the members.  Mio Sylvester was then named as manager of each LLC.

37.    HVB has admitted that the members of the LLCs were merely involved for tax purposes:

> HVB and its co-conspirators knew that the foreign third parties who entered the CARDS transactions were merely nominees who had no legitimate business purpose in entering the transaction and who were simply being paid to lend their neutral U.S. tax status to the transaction in order to enable the U.S. client to obtain their claimed tax benefits.

38.    The LLC would then enter into a euro denominated loan with a large international bank.  The size of the loan was generally determined by the size of the tax deduction to be created for the CARDS customer.  The loan proceeds would then be used to purchase two certificates of deposit (CDs) from the lender.  One of the CDs was purchased with 85% of the loan proceeds and one was purchased with the remaining 15%.  Both CDs were immediately pledged back to the lender as collateral for the loan.  At no time did the loan proceeds leave the custody and control of the lender.

39.     The CARDS customer would purchase the 15% portion of the loan in exchange for his or her assumption of joint and several liability for 100% of the LLC's loan on a joint and several basis; the CARDS customer would also agree to pay 100% of the principal of the loan at maturity. The CARDS customer would then convert the 15% euro denominated CD to a U.S. dollar denominated CD and give the CD back to the lender as collateral for the loan. In practice, this money and the CDs never left the custody and control of the lender, unless other acceptable collateral was transferred to the lender.

40.     According to the CARDS Dealers, the CARDS customer's conversion of the 15% euro denominated CD into U.S. dollars is a taxable event. The CARDS Dealers represented that the entire loan amount would become the CARDS customer's basis in the 15% CD so that the CARDS customer could claim a large income tax loss. In other words, the transaction was designed to inflate the CARDS customer's basis in the converted 15% CD for income tax purposes in order to generate a large loss. For example, if the loan amount was $100 million and the CARDS customer converted the 15% euro denominated CD into a $15 million CD, the CARDS customer would then claim an $85 million loss - the difference between the total amount of the loan and the amount theoretically received by the CARDS customer. This loss would be used to offset ordinary income.

41.     Including money borrowed in the cost basis of a purchased asset is a familiar concept. However in this case, because the 85% CD and the 15% CD held by the lender could and would be used to repay the loan, there was no risk of loss to the CARDS customer. The Defendants used their fiduciary position and reputation to assure Plaintiffs that CARDS was a legitimate transaction. The Defendants, however, knew that the loss could not be taken and that the deduction would be denied when discovered.

## 2.    *CARDS Was a Conspiracy Solely to Generate Fees*

42.    CARDS required several classes of players: an arranger of a transaction who would coordinate the parties (Chenery); law firms to render opinions and create the transaction documents (such as Sidley); a lender (HVB); and finders, who would identify potential assuming parties and introduce them to Chenery in exchange for a fee.  In the Plaintiffs' transactions, the CARDS Dealers pitched the deal to Michael DeSiato at CBIZ, who in turn pitched it to his clients, the Plaintiffs. Together these CARDS Dealers constituted an enterprise.

### (a) *Chenery Acted As The Arranger/Organizer For CARDS*

43.    Chenery, led by Roy Hahn, was the "arranger of the transaction."  In other words, Chenery would identify and market the transaction to lenders, coordinate with the lenders on the documentation for the transaction, identify the LLCs and LLC members, market the transaction to finders, and choose suitable assuming parties from the corporations and individuals identified by finders.  Chenery would also receive the fees from the assuming parties and distribute those to the other players according to its confidential fee structure.

### (b) *Sidley, or others, Issued Legal Opinions Supporting The CARDS Scheme*

44.    The CARDS facility was promoted to individuals, including Plaintiffs, by telling them that nationally renowned and prestigious law firms such as Sidley had reviewed the transaction and would be Plaintiffs' legal counsel to provide opinion letters.  These opinion letters would bless the CARDS facility and confirm that the tax advantages would be recognized by the IRS for income tax purposes.

45.    For example, a Chenery brochure claims that the legal opinions supporting its tax plans would protect participants from being assessed penalties by the IRS:

MYTH:
Tax-planning strategies can result in penalties if the IRS rejects a claimed tax benefit.
ANSWER:

Each tax plan arranged by Chenery Associates is backed by a favorable legal opinion addressed directly to the client. This opinion is in the form required by Treasury regulations to eliminate penalty risk for individuals. In addition, it is part of the minimum requirements standard for corporations.

46.     Similarly, a Chenery presentation about CARDS claimed that a "[f]avorable tax opinion by major New York law firm eliminates penalty risk."

48.     Hahn testified that Sidley and other law firms lent their reputation to enhance the credibility of Chenery and CARDS because, where a law firm issued an opinion, the impression was that the entire firm was standing behind the opinion.

(c) *HVB and other Banks Provided the Necessary Funding*

47.     A total of five banks funded CARDS loans: Bankers Trust, Deutsche Bank, Heller Financial, HVB, and Zurich Capital Management ("Zurich Bank"). According to documents produced by Chenery in *Sussex Financial Enterprises v. HVB*, No. C-08-4791, N. D. CA., the CARDS Dealers loaned at least €2,296,667,970 in CARDS loans.

48.     In the fall of 2000, Hahn made contact with Dom DeGiorgio of HVB so that HVB could act as a lender. HVB proceeded to fund approximately 29 CARDS loans in 2000. On information and belief, HVB helped refine and design the structure of the CARDS transactions. HVB assisted in formulating the manner in which a taxable event would be created and a method by which HVB promissory notes would be utilized for the purpose of creating assets that could be purportedly sold at a loss so that a large tax benefit could be claimed on behalf of the taxpayers who participated in the program.

49.     In helping structure and develop the CARDS Facility transactions, HVB engaged in numerous communications with Chenery. For example, HVB personnel, including Domenick DeGiorgio and Bill Tsai, engaged in hundreds of telephone calls with Roy Hahn of Chenery Associates relating to the design, marketing, and implementation of the CARDS strategy from the fall of 2000 through 2001.

13

50.    Starting in 2000, Chenery and HVB marketed the CARDS strategy to Plaintiffs. They failed to disclose that, in fact, the transaction was one that defendants knew would not be accepted by the IRS for income tax purposes and would, instead, be considered an illegal tax shelter. Plaintiffs were therefore misinformed and mislead about the nature and soundness of the CARDS Facility.

51.    According to the deposition of Roy Hahn, HVB initially agreed to fund the CARDS strategy in exchange for approximately 125-150 basis points per loan.  However, in 2001, HVB complained that its role in the CARDS Transaction did not generate sufficient fees. Consequently, HVB requested and received a substantial additional payment for its role.

52.    Hahn further testified that HVB was paid over $4 million in origination fees alone for the CARDS Transactions it funded.

### 3.    The CARDS Dealers Knew that CARDS Would Not Be Upheld

53.    On or about December 27, 1999, the IRS issued Notice 1999-59 entitled "Tax Avoidance Using Distributions of Encumbered Property."  The notice warned that the IRS had become aware of certain types of transactions "being marketed to taxpayers for the purpose of generating tax losses."  IRS Notice 1999-59 warned that such transactions consisted of a "contrived series of steps" by which "taxpayers claim tax losses for capital outlays that they have in fact recovered."  IRS Notice 1999-59 stated that such "artificial losses" are not allowable for federal income tax purposes.

54.    In August 2000, the IRS published Notice 2000-44, entitled "Tax Avoidance Using Artificially High Basis," addressing similar transactions to Notice 1999-59.  Notice 2000-44 described a basis-shifting transaction, concluding that "purported losses from these transactions (and from any similar arrangements designed to produce noneconomic tax losses by artificially overstating basis ...) are not allowable as deductions for federal income tax purposes."

14

55.     In December 2000, Lee Sheppard, a contributing editor at Tax Analysis, published an article in Tax Notes entitled "The Synthetic Euro Borrowing Tax Shelter" describing the CARDS facility and concluding that CARDS transactions do not have any economic substance for income tax recognition purposes.  The Defendants were aware of or should have been aware of this article.

56.     As a result of IRS Notices 1999-59 and 2000-44, both of which were issued prior to the 2000 opinion letters and Plaintiffs' agreement to enter into CARDS transactions, the CARDS Dealers knew that the CARDS transaction would not be a legitimate means for declaring losses for income tax purposes.

57.     The opinion letters issued in connection with CARDS discussed IRS Notice 2000-44, but argued: the IRS did not have authority to issue the notice; the notice was merely persuasive authority and not binding on a court, though it would have to be factually distinguished; and distinguished the authority cited by Notice 2000-44 on the grounds that "in the instant case the Transactions were motivated by non-tax reasons and so more likely than not would be treated as 'shams in substance'..." so "it is more likely than not that the authorities cited in Notice 2000-44 would not provide a basis for denying the deduction of a loss sustained from the Transactions."

58.     HVB also understood the tax shelter implications of the CARDS Facility, because, on information and belief, its outside counsel, Shearman & Sterling, engaged in several calls with the other CARDS Dealers, including Chenery.  These calls occurred in September and October of 2000, and during them, HVB and/or Shearman & Sterling specifically discussed the tax aspects of the CARDS Facility transaction and whether CARDS transactions had to be registered as tax shelters. In December 2000, drafts of letters and other documents were negotiated and exchanged between Shearman & Sterling, representing HVB, and Chenery.  All documents delivered to Chenery were

15

sent to its San Francisco offices and all drafts from Chenery were sent from its San Francisco offices. During the course of these negotiations, Shearman & Sterling and HVB made it clear that they understood that the IRS "would not like" the CARDS transactions.

59.     On information and belief, HVB failed to register any of the CARDS transactions in which it engaged, despite the fact that approximately 40 other CARDS transactions, including ones implemented by Deutsche Bank, were registered as tax shelters. HVB must have known that these prior CARDS transactions were registered as tax shelters, yet HVB did not register or advise any of its own clients about these tax shelter registrations.

60.     On or about October 15, 2004, the IRS issued a Coordinated Issue Paper on the CARDS facility, concluding again that the CARDS transaction lacked economic substance and that it was not allowable for federal income tax purposes.

61.     The IRS has vigorously pursued participants in CARDS transactions.

62.     However, none of the CARDS Dealers have withdrawn the advice or opinions they issued on the transaction.

63.     In fact, the CARDS facility was nothing more than a sham transaction designed to "create" paper losses for income tax purposes and defendants knew that the CARDS facility was a sham transaction that would not generate any profits and would not be recognized by federal or state taxing authorities for income tax purposes.

## IV.     CARDS DEALERS HAVE BEEN INDICTED OR SETTLED WITH THE UNITED STATES GOVERNMENT AND HAVE BEEN THE SUBJECT OF NUMEROUS CIVIL LAWSUITS ARISING OUT OF CARDS

### A.     R.J. Ruble and Sidley

64.     On May 23, 2007, Sidley entered into a Closing Agreement with the IRS in which it agreed to pay "a $39.4 million civil penalty to the IRS to resolve the IRS's tax shelter promoter penalty audit of Sidley." At the same time, the DOJ announced its decision not to prosecute Sidley.

65.    Sidley issued a public statement of responsibility in which it admitted "that its role with respect to certain tax shelter transactions wrongly and fraudulently deprived the U.S. Treasury of significant tax revenues."

66.    In its public statement, Sidley admitted that its tax partner Ruble authored opinion letters in support of tax shelters:

> Ruble was involved in, and issued opinions for, transactions for certain high net worth individuals.  Ruble's conduct in those transactions defrauded the U.S. Treasury of taxes owed by those taxpayers.  Ruble became involved in these transactions in 1996 while a partner at Brown & Wood.  He authored opinions on a number of different tax shelter transactions, including Bond Linked Issue Premium Structure ("BLIPS"), Foreign Leveraged Investment Program ("FLIP"), Offshore Portfolio Investment Strategy ("OPIS"), Short Option Strategy ("SOS"), and Custom Adjustable Rate Debt Structure ("CARDS").

67.    Ruble was called to testify before the Senate Permanent Subcommittee on Investigations in November 2003, but he refused to answer any questions on the grounds of the Fifth Amendment right against self-incrimination.  Ruble was later indicted in the United States District Court for the Southern District of New York, and was convicted of 10 counts of tax evasion. In April 2009, he was sentenced to six and a half years imprisonment.

68.    Sidley and Ruble have been named as defendants in a number of civil lawsuits related to CARDS transactions and other tax shelters.

**B.    HVB**

69.    In February 2006, HVB entered into a Deferred Prosecution Agreement with the United States DOJ.  In the agreement, HVB agreed to pay $29,635,125 to the United States, which included disgorgement of $16,195,999 in fees received from its tax shelter activities, restitution, and penalties.

70.    The agreement also stated:

> HVB admits and accepts that, as set forth in detail in the Statement of Facts, … through the conduct of certain HVB employees, during the period from 1996 through 2003, HVB assisted high net worth United States citizens to evade United States individual income taxes on over $1.8 billion in capital gain and ordinary income by participating in and implementing

fraudulent tax shelter transactions, including Bond Linked Issue Premium Structure ("BLIPS"), Custom Adjustable Rate Debt Structure ("CARDS"), and certain tax shelter transactions involving non-resident alien individuals and other tax-indifferent parties. HVB personnel engaged in conduct that was unlawful and fraudulent, including: (i) agreeing to participate in fraudulent tax shelter transactions; and (ii) preparing and signing false and fraudulent factual recitations, representations, and documents as part of the documentation underlying the shelters.

71.     In a related Statement of Admitted Facts, HVB admitted that "between 1996 and 2002 HVB participated in a number of fraudulent tax shelter transactions devised by others, including a series of transactions known as 'Bond Linked Issue Premium Structure' ('BLIPS'), 'Custom Adjustable Rate Debt Structure' ('CARDS'), 'common trust fund,' and '357(c)' transactions."

72.     Domenick DeGiorgio, an HVB executive, pled guilty in August 2005 to tax fraud conspiracy, tax evasion, and wire fraud for his involvement in BLIPS transactions.

73.     HVB has also been sued by CARDS plaintiffs in civil court.

## V.     PLAINTIFFS' CARDS TRANSACTION

74.     Kibler and Kipnis had been employees of Miller & Solomon, Inc. for a number of years before they acquired the business in 1985 from the company's founders, Messrs. Solomon and Miller and formed Miller & Solomon General Contractors, Inc. ("M & S"). M & S became one of the largest general contractors in south Florida. Although M & S built a variety of major structures, including a five-building medical school complex at Nova Southeastern, that school's Huizenga Business School, and the Miami Dolphins' training facility, it was primarily engaged in the construction of residential buildings, such as high-rise condominium and apartment buildings.

75.     In 1999 M & S incurred a loss of over $3 million in connection with its construction of a 26-story building. That loss substantially reduced M & S' working capital just as south Florida entered a construction boom. Because of the anticipated construction boom, Plaintiffs wanted to increase M & S' bonding capacity. Plaintiffs attempted, but were unable, to secure long-term

financing for M & S through conventional bank sources. Mr. Kipnis asked his father to lend M & S money, but he refused because M & S had previously borrowed $2.5 million from him and he had no additional funds available. Plaintiffs also approached Merrill Lynch (where M & S had a line of credit for short-term loans) about obtaining long-term financing, but they were rebuffed.

76.     Michael DeSiato was both Plaintiffs' and M & S' accountant. In 2000 he was introduced to Hahn. Mr. DeSiato told Plaintiffs that CARDS could be the type of financing that could be contributed to M & S and thus increase its bonding capacity as well as provide tax benefits which would flow to Plaintiffs. Plaintiffs analyzed the CARDS strategy to determine whether it would allow M & S to participate in more construction projects. Plaintiffs decided to enter into the CARDS transaction, doing so in December 2000.

77.     Neither Mr. Kibler nor Mr. Kipnis examined the numerous steps of the CARDS transaction. Moreover, neither Mr. Kibler, Mr. Kipnis nor Mr. DeSiato fully understood the complicated machinations involved in a CARDS transaction. Instead, Plaintiffs relied on the reputations of Sidley and HVB.

78.     On October 11, 2000, Wimbledon was formed, commencing the CARDS transaction. On December 5, 2000, Wimbledon entered into a credit agreement with HVB, whereby HVB agreed to lend Wimbledon €6,700,000 for a 30–year period (credit facility). Interest on that loan accrued annually with the exception of the first and second interest periods, which occurred in the first year of the loan. The interest rates on the loan were to be reset annually by HVB.

79.     On December 5, 2000, Wimbledon informed HVB that it intended to borrow the €6,700,000 and requested that the money be credited to its account. Wimbledon issued a promissory note to HVB for €6,700,000, maturing on December 5, 2030, and HVB credited the amount to Wimbledon's account. Wimbledon entered into a master pledge and security agreement in favor of HVB, pledging as collateral all of Wimbledon's holdings at HVB. On the same day,

19

Wimbledon purchased an HVB time deposit of €5,679,792, maturing on December 5, 2001. The interest earned on Wimbledon's time deposit was 50 basis points less than the interest Wimbledon owed HVB on the loan.

80. On or about December 21, 2000, Kibler, Kipnis and Wimbledon entered into a purchase agreement whereby Wimbledon sold each Plaintiff a portion of the credit facility in the form of a term deposit in the amount of €502,500 (for a total of 1,005,000), plus accrued interest, held in Wimbledon's pledged HVB account. This amounted to 15% of the €6,700,000 Wimbledon borrowed under the credit facility. The money was transferred to Kibler and Kipnis' HVB account on December 27, 2000. The purchase agreement provided that Plaintiffs would be jointly and severally liable for all obligations under the credit facility not covered by Wimbledon's collateral.

81. Wimbledon also entered into assumption agreements with Kibler and Kipnis on December 21, 2000, pursuant to which Plaintiffs agreed to assume joint and several liability for Wimbledon's obligations under the credit facility, including the repayment of the credit facility's principal of €6,700,000.

82. Kibler and Kipnis pledged as collateral all their right, title, and interest in the deposit accounts, securities accounts, and other instruments and investment property held with HVB, as well as all proceeds thereof.

83. With these agreements in place, the three parties, Wimbledon (the borrower), HVB (the bank), and Kibler and Kipnis (the assuming parties), began taking a number of actions to execute the assumption of the credit facility. First, on December 21, 2000, each Plaintiff wired $599,000 to HVB, a total of $1,198,000, to serve as cash collateral to secure his obligation to HVB. The money was used to purchase three time deposits that would mature on December 5, 2001. Then, on December 27, 2000, HVB transferred €1,005,000 into Plaintiffs' HVB account. On that date, HVB exchanged €733,750 of the €1,005,000 credited to Plaintiffs for $682,387.50, at a rate of

.93 dollars to the euro.   On January 11, 2001, HVB exchanged the remaining €271,250 of the €1,005,000 credited to Plaintiffs for $256,331.25, at a rate of .945 dollars to the euro.

84.   When Kibler and Kipnis deposited the $1,198,000 with HVB, HVB allowed M & S to withdraw the $1,037,680 in credit facility proceeds from the bank to use as it wished.   On January 11, 2001, Kibler and Kipnis began using the proceeds from the credit facility by wiring (1) $382,000 from their HVB account to an account held by Chenery as the promoter of the CARDS transaction, which used a portion of these funds to pay Mr. DeSiato, and (2) $556,718.75 to M & S' account at Mellon Bank.

85.   On November 13, 2001, less than a year after the initiation of the CARDS transaction, HVB informed Plaintiffs that December 5, 2001, the date that Plaintiffs' three time deposits would mature as well as the ending date of the forward contract, would be the mandatory prepayment date.   Moreover, on that date, Plaintiffs' deposits at HVB were converted to euro at the December 22, 2000, exchange rate pursuant to the forward contract.   Had the dollars been converted to euro at the December 5, 2001, exchange rate, Plaintiffs would have had a $70,200 profit.   All of the borrowed funds were repaid with the pledged collateral, and no additional capital contributions were ever made.

86.   Euston Financial Trading LLC ("LLC") is a special purpose limited liability company, organized under the laws of Delaware.   100% of the interests in LLC is owned by two nonresident alien individuals ("Members") who have represented that each is tax resident in the United Kingdom.   Members have also represented that LLC is tax resident in the United Kingdom. Member has capitalized LLC with recourse notes equal in the aggregate to 3% of the principal amount of the Loan, as defined below.   Each Member has represented that the Member is solvent and has the financial wherewithal to meet such Member's obligations under the recourse note.

87.     To create the financing, LLC has entered into a loan agreement dated as of December 14, 2000 (such loan agreement together with the collateral security agreements related thereto are hereinafter collectively referred to as the "Loan Agreement" or "Loan") pursuant to which it has borrowed €1,800,000 from HVB Structured Finance Inc. ("Bank") for a term of 30 years.  Interest under the Loan Agreement is payable annually in arrears and the entire principal amount is due and payable at maturity.  The interest rate is generally reset every year pursuant to an interest spread reset mechanism described below.

88.     Upon receipt of the proceeds of the Loan, LLC purchased the Foreign Currency having an aggregate principle amount of €1,800,70, which, together with cash, it deposited with Bank as collateral for the Loan.

89.     Under the terms and conditions of the Loan Agreement:

  i.      The Loan is made with full recourse to LLC, and is secured by the Loan proceeds and other collateral as specified in the Loan Agreement;

  ii.     LLC has the right to substitute for the initial collateral other collateral acceptable to Bank;

  iii.    LLC has the right to assign its obligations under the Loan Agreement to another party as co-obligor under certain conditions, including that such party be acceptable to the Bank; and

  iv.     The Loan cannot be prepaid for 12 months following the execution of the Loan Agreement.

As a general matter, Bank is free to pursue any remedy available to it in the event of a default against either LLC or any co-obligor.

90.     Under the Loan Agreement, upon the date for an interest rate reset, the Bank may inform the borrower that it is unwilling to maintain the Loan in whole or in part and if it is, inform the borrower of the rate at which it would do so.  LLC (or if there is a co-obligor, LLC and the co-obligor) may reject the proposed rate or, alternatively, present another financial institution that will acquire the Loan from Bank.  In the event that LLC does not accept the reset rate and does not

provide a financial institution to acquire the Loan from Bank, the Loan will become due and payable in full.

91.    To create the synthetic zero coupon financing, Chenery and LLC calculated the present value of the principal amount of the Loan using a market rate of interest which represents a reasonable rate of interest on such a zero coupon instrument.  On December 21, 2000, LLC sold to Assuming Party the Foreign Currency having a principal amount and fair market value equal to such present value pursuant to a Purchase Agreement ("Purchase Agreement").  The remainder of the Loan proceeds remains invested in cash or in foreign government or high-grade Euro-denominated corporate obligations, as collateral for the Loan.  The Foreign Currency was released as collateral under the Loan once it was sold to Assuming Party.  Assuming Party, however, provided other collateral to secure Assuming Party's obligation to Bank.  The consideration LLC received from Assuming Party in exchange for the Foreign Currency is Assuming Party assuming and becoming jointly and severally liable as a co-obligor on the Assumed Obligations under the Loan Agreement and meeting such other requirements as are provided in the Loan Agreement.

92.    Between the time LLC received the proceeds of the Loan and the time LLC entered into negotiations with the Assuming Party to acquire the Foreign Currency, there was no communication between LLC and Assuming Party regarding the purchase of the Foreign Currency.

93.    Pursuant to the Purchase Agreement, LLC and Assuming Party determined the manner in which responsibility, vis-à-vis each other, for payments pursuant to the Loan Agreement is shared, while recognizing that they remain jointly and severally liable to the Bank for the entire amount of principal and interest on the Loan.  As a result LLC undertook to make all interest payments under the Loan Agreement and Assuming Party undertook to pay the principal due under the Loan Agreement at maturity.  Under the Loan Agreement, if the Loan is prepaid, the collateral is to be surrendered and the co-obligors will utilize their own funds to satisfy any shortfall that might

arise.   Under the Purchase Agreement, LLC and Assuming Party also agreed to waive their respective rights of contribution against each other under local law.

94.   On December 28, 2000, Assuming Party sold the Foreign Currency.

## VI.   IRS INVALIDATES CARDS STRATEGY

95.   The Internal Revenue Service determined deficiencies in income tax with respect to (1) Donald J. Kipnis of $650,914 for 2000 and $346,495 for 2001; (2) Lawrence L. Kibler of $629,361 for 2000 and $351,973 for 2001, related to the IRS disallowance of the tax treatment accorded to the CARDS strategy.  The IRS concluded that the CARDS transaction lacked economic substance, and consequently he disallowed the losses generated therefrom.  Plaintiffs challenged the IRS determination.

96.   Plaintiffs have been damaged in the substantial fees (and interest payments) made to defendants and the other CARDS Dealers, legal fees and expenses paid in defending the CARDS strategy, and in interest due to the government.

## COUNT I
## VIOLATION OF FLORIDA STATUTE 772.17

97.   Plaintiffs reassert and incorporate by reference all of the foregoing allegations in their entirety and further allege:

98.   The CARDS Dealers associated with each other to form an enterprise for the purpose of promoting and selling various tax products in order to receive large fees.

99.   The CARDS Dealers arrangement described herein constitutes an ongoing organization, with an ascertainable structure and purpose beyond the predicate acts and the conspiracy to commit such acts, by which HVB and the other CARDS Dealers functioned as a continuing unit comprised of said Defendants.

100.   The CARDS Dealers engaged in a pattern of unlawful activity consisting of a scheme or artifice to defraud Plaintiffs and other individuals by using the CARDS Dealers' reputations to

induce them to enter into CARDS transactions. The CARDS Dealers, including HVB, engaged in a pattern of criminal activity to defraud Plaintiffs and others into using the CARDS Strategy, for the sole purpose of enriching the CARDS Dealers.

101.    The CARDS Dealers promoted the CARDS transactions and conducted or helped conduct the financial transactions that were a part of the CARDS facility tax shelter.

102.    The CARDS Dealers knew that the CARDS transaction was unlikely to be upheld by the taxing authorities, but marketed and sold these transactions anyway in order to generate substantial fees.

103.    The CARDS Dealers engaged in this scheme or artifice to defraud over a period of over a year for the CARDS tax shelter alone.

104.    Some of the CARDS Dealers' conduct of the enterprise and their pattern of unlawful activity commenced in at least 1999, well before when they and the remaining Defendants first contacted Kibler and Kipnis in 2000 to solicit their participation in the CARDS scheme.

105.    HVB's participation was integral to Plaintiffs entering into and claiming the tax benefits of the CARDS transaction. HVB itself was integral to the conduct of the enterprise.

106.    The CARDS Dealers induced the Plaintiffs to enter into a CARDS transaction. This act was related to the rest of their tax shelter scheme in purpose, results, participants, methods of commission, and similarity of victims. This behavior constituted a pattern of unlawful activity over an extended period of time.

107.    In connection with Plaintiffs' CARDS transactions, the CARDS Dealers made the following representations as part of their pattern of unlawful activity:

- CARDS was legitimate and a good investment for Plaintiffs.
- HVB intended to maintain the loans for 30 years.
- The Sidley opinions would provide protection to Plaintiffs in the event the tax deductions were disallowed by the IRS.

25

108.     Also in connection with Plaintiffs' CARDS transactions, the CARDS Dealers omitted material facts that were necessary to render not misleading the remainder of their representations.   The CARDS Dealers omitted these facts as part of their pattern of unlawful activity.

- The CARDS transaction should have been registered as a tax shelter with the IRS.
- The pre-packaged nature of the CARDS transactions.
- The lack of risk inherent in the structure of the transaction would negate the claimed tax benefits.
- CARDS had similarities to other tax strategies already rejected by the IRS and listed by the IRS as potentially abusive tax shelters.
- The roles of HVB, Chenery, Hahn, Sidley, and Rubleas promoters and the consequences of that role.
- The roles that Ruble and Sidley played in developing CARDS would mean that the IRS could take the position that the clients would be unable to rely on opinion letters from them in the event of an audit.
- The CARDS Dealers were acting in concert with each other.
- The legal analysis in the Sidley letters was fundamentally flawed and would not be upheld by the relevant state or federal authorities.

109.     In addition to the Plaintiffs' CARDS transactions, on information and belief, HVB and the CARDS Dealers induced at least 29 other investors to enter into CARDS transactions between 1999 and 2002.   These acts were related to each other in purpose, results, participants, methods of commission, and similarity of victims.   This behavior constituted a pattern of unlawful activity and amounted to a period of continued unlawful activity between 1999 and 2002.

110.   The CARDS Dealers' conduct as set forth herein was in concert with each of the other CARDS Dealers' conduct, and planned and pre-arranged with and known by each of the other said CARDS Dealers pursuant to said CARDS Dealers common scheme to sell tax strategies.

111.   The CARDS Dealers conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity and criminal activity consisting of; inter alia, more than two acts of mail fraud, wire fraud, interstate transportation in aid of racketeering, money laundering, engaging in transactions in property derived from unlawful activity, transportation of fraudulently obtained monies, and bribery (in violation of 18 U.S.C. §§ 1341, 1343, 1952, 1956, 1957,

26

and 2314.).  As part of this pattern, continuing over the course of years, by using the mails, private

Interstate carriers and interstate wire communications, said defendants, through their Enterprise,

sold these and other fraudulent tax schemes beginning as early as 1999-2000.  In particular, without

limitation, in violation of 18 U.S.C. §§ 1341 and 1343, the CARDS Dealers employed the Postal

Service and/or private or commercial interstate carriers and/or interstate wire communications to

send their retainer letters, invoices, opinion letters, tax advice, and investment advice to Plaintiffs

and others who implemented the CARDS Strategy and other tax shelters.

112.   Plaintiffs are entitled to recover damages that reasonably flow from the CARDS

Dealers' pattern of unlawful activity in promoting, facilitating, and misrepresenting the business

purpose and legality of the CARDS facility, including, but not limited to, the CARDS transaction

fees paid to the CARDS Dealers, the attorneys' and accountants' fees paid by all Plaintiffs in

litigating against the IRS, back taxes and interest paid by Plaintiffs to the taxing authorities, and such

other and further damages as reasonably flow therefrom.

113.   Plaintiffs' damages were a reasonably foreseeable result of the CARDS Dealers'

pattern of unlawful activity.

114.   Plaintiffs are entitled to compensatory and treble damages and attorneys' fees and

costs.

## COUNT II
## COMMON LAW FRAUD

115.   Plaintiffs reassert and incorporate by reference all of the foregoing allegations in their

entirety and further allege:

116.   In order to induce Plaintiffs to pay fees for the CARDS transaction, the CARDS

Dealers made numerous knowingly misleading representations and intentional omissions of material

fact to Plaintiff, including, but not limited to: failing to disclose that the CARDS transaction would

not entitle a taxpayer to claim for income tax purposes losses recognized from the transaction;

failing to disclose existing published authority, including notices published by the IRS, that purported losses arising from similar transactions are not allowable for income tax purposes; promoting and developing a transaction while knowing that it was not likely to be allowable for income tax purposes; promoting the CARDS Facility as a legitimate transaction, when in fact, it was nothing more than a sham transaction designed to create artificial paper losses for tax purposes; concealing the manner in which the CARDS Facility worked; concealing the illegal nature of the CARDS Facility, including the impact of the IRS notice listing it as an abusive tax shelter; failing to disclose that HVB was not acting as an "independent" bank but was operating together with the other defendants; failing to disclose that the opinion letters were not issued independently and were nothing more than boilerplate opinions designed to induce Plaintiffs to enter into the CARDS Facility transaction; failing to disclose that the authors of these opinion letters had a pecuniary interest in the CARDS transaction and had helped to develop and/or promote the transaction; and failing to disclose that the CARDS transaction had to be registered as tax shelters, but were not.

117.    Each of the foregoing misrepresentations and omissions, together with all others described in this Complaint, were material to Plaintiffs' decisions to enter into the CARDS transactions.

118.    HVB made the above-listed misrepresentations and omissions of material facts intending that Plaintiffs rely thereupon in determining whether to enter into the CARDS transaction.

119.    The CARDS Dealers acted individually and as each other's agents in the CARDS transactions.   Thus, knowledge acquired (or knowledge recklessly not acquired) by each of the CARDS Dealers is imputed to HVB.

120.    Plaintiffs did not know that HVB's representations were false or that HVB and/or the CARDS Dealers were omitting material facts.

121.     Plaintiffs relied on HVB's representations and/or their material omissions in deciding to enter into CARDS transactions, in claiming deductions related to the CARDS transactions on their tax returns, and in continuing to assert the CARDS-related deductions despite IRS warnings. Plaintiffs' reliance was reasonable in light of HVB's reputation and the reputations of the other CARDS Dealers.

122.     Plaintiffs are entitled to recover damages that reasonably flow from HVB's fraud, including, but not limited to, the CARDS transaction fees paid to the CARDS Dealers, the attorneys' and accountants' fees paid by Plaintiffs in litigating against the IRS, back taxes and interest paid by Plaintiffs, and such other and further damages as reasonably flow therefrom.

123.     Plaintiff is informed and believes and on that basis alleges that the defendants' conduct was willful, malicious, reckless, wanton and in knowing disregard of their professional obligations, such that Plaintiffs are entitled to recover exemplary damages against the defendants in an amount to be determined at trial.

**COUNT III**
**AIDING AND ABETTING FRAUD**

124.     Plaintiffs reassert and incorporate by reference all of the foregoing allegations in their entirety and further allege:

125.     In connection with the promotion of the CARDS transaction, CARDS Dealers Chenery, Hahn, Sidley, and Ruble made misstatements of material fact, including, but not limited to:

- CARDS was a legitimate investment and legal under the tax laws.
- HVB represented that it intended to, or at the least was open to, maintaining the loans for 30 years.
- HVB represented that CARDS was routine and ordinary and that CARDS had the necessary legal, tax, and accounting approval from national highly accredited firms.
- Sidley represented in its opinion letters that it was more likely than not that Plaintiffs' tax basis in the CARDS loans would be the principal amount of the loan plus the amount of transaction fees paid to obtain the loan.
- Sidley represented in its opinion letter that it was more likely than not that any

gain or loss recognized by Assuming Party upon the disposition of the Foreign Currency would be characterized as ordinary gain or loss.

- Sidley represented in its opinion letters that it was more likely than not the IRS would not be successful in changing the timing, character, or source of the loss recognized by Plaintiffs.
- Sidley represented in its opinion letters that it was more likely than not that CARDS had the requisite economic substance and business purpose to be respected under the existing tax law.

126.    Also in connection with the promotion of the CARDS transaction, Chenery, Hahn, Sidley, and Ruble knew or were reckless in failing to ascertain that certain material facts were omitted, that were necessary to render not misleading the remainder of their representations. Those omitted facts include, but are not limited to, the following:

- The CARDS transaction should have been registered as a tax shelter with the IRS.
- HVB was receiving a portion of the CARDS fees paid to Chenery.
- The pre-packaged nature of the CARDS transactions.
- The lack of risk inherent in the structure of the transaction would negate the claimed tax benefits.
- CARDS had similarities to other tax strategies already rejected by the IRS and listed by the IRS as potentially abusive tax shelters.
- The roles of HVB, Chenery, Hahn, Sidley, Ruble as promoters and the consequences of that role.
- The role that Ruble and Sidley played in developing CARDS would mean that the IRS could take the position that the clients would be unable to rely on opinion letters from them in the event of an audit.
- The CARDS Dealers were acting in concert with each other.
- The legal analysis in the Sidley letters was fundamentally flawed and would not be upheld by the relevant state or federal authorities.

127.    HVB knew or was generally aware that the representations and omissions of Chenery, Hahn, Sidley, and Ruble were fraudulent and that they were omitting material facts.

128.    HVB and DeGiorgio had knowledge of the CARDS Dealers' fraud and provided substantial assistance or encouragement to Chenery, Hahn, and Sidley in the fraudulent conduct described above by, inter alia, providing financing for the CARDS transaction.

129.    HVB provided that substantial assistance or encouragement with the intent of promoting the CARDS scheme.

130.     Plaintiffs are entitled to recover damages that reasonably flow from HVB's aiding and abetting fraud, including, but not limited to, the CARDS transaction fees paid to the CARDS Dealers, the attorneys' and accountants' fees paid by Plaintiffs in litigating against the IRS, back taxes and interest paid by Plaintiffs, and such other and further damages as reasonably flow therefrom.

131.     Plaintiffs are also entitled to punitive damages in an amount to be determined at trial.

## COUNT IV
## CIVIL CONSPIRACY

132.     Plaintiffs reassert and incorporate by reference all of the foregoing allegations in their entirety and further allege:

133.     As described herein, the CARDS Dealers entered into an agreement to defraud Plaintiffs, and other CARDS investors not named herein, by misrepresenting the legitimacy and tax consequences of the investment.

134.     The CARDS Dealers each committed overt acts in furtherance of the conspiracy, including, but not limited to, the following:

- The issuance of "more likely than not" tax opinions by Sidley, and others, despite their conflicts of interest.
- The implementation of the loans to the LLCs and structuring of the various related transactions.
- Failing to advise Plaintiffs to amend their tax returns.

135.     The CARDS Dealers' agreement to defraud Plaintiffs, and other CARDS investors not named herein, can be inferred by their cooperation in creating the tax opinion letters and in failing to disclose the 1999 and 2000 IRS notices to Plaintiffs, their attempts to conceal their fraud after the transactions.

136.     The CARDS Dealers were motivated to conspire to defraud Plaintiffs in order to generate millions of dollars in fees.

31

137.    The CARDS Dealers intended to defraud Plaintiffs by representing that the CARDS transaction was legitimate and that it was more likely than not that the transaction would be considered legitimate by the taxing authorities.

138.    The CARDS Dealers made positive, distinct misrepresentations and fraudulently concealed material information as outlined above.   They made these misrepresentations and omissions pursuant to their agreement to defraud Plaintiffs and other CARDS investors not named herein.

139.    Plaintiffs are entitled to recover damages that reasonably flow from the CARDS Dealers' conspiracy to commit fraud, including, but not limited to, the CARDS transaction fees paid to the CARDS Dealers, the attorneys' and accountants' fees paid by all Plaintiffs in litigating with the IRS, back taxes and interest paid by Plaintiffs to the taxing authorities, and such other and further damages as reasonably flow therefrom.

140.    Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

### COUNT V
### BREACH OF FIDUCIARY DUTY

141.    Plaintiffs reassert and incorporate by reference all of the foregoing allegations in their entirety and further allege:

142.    HVB owed Plaintiffs fiduciary duties by virtue of their role as Plaintiffs' lender, its superior knowledge of the CARDS transaction, the control HVB retained over Plaintiffs' accounts under the CARDS transaction and the trust and confidence that the Plaintiffs reposed in HVB.

143.    HVB owed Plaintiffs fiduciary duties to deal with them honestly and forthrightly and with full disclosure of all material facts.   In addition, HVB had a duty to reveal facts unknown to Plaintiffs of which they were aware which affected Plaintiffs' legal rights and liabilities, including the full circumstances concerning the opinion letters provided by the CARDS Dealers and the CARDS Dealers relationships and the true analysis of the CARDS strategy.

32

144.     HVB owed the Plaintiffs fiduciary duties to act, with adequate skill and care, in their best interest and to protect their interests.

145.     HVB violated their fiduciary duties to Plaintiffs by failing to reveal material information, by concealing material information from Plaintiffs, by committing fraud, by failing to advise Plaintiffs of their conflicts of interest, and by advising Plaintiffs to enter into the CARDS transaction.

146.     Plaintiffs are entitled to recover damages that reasonably flow from HVB's breaches of their fiduciary duties, including, but not limited to, the CARDS transaction fees paid to the CARDS Dealers, the attorneys' and accountants' fees paid by Plaintiffs in litigating against the IRS, back taxes and interest paid by Plaintiffs and such other and further damages as reasonably flow therefrom.

147.     Plaintiffs are entitled to punitive damages in an amount to be determined at trial.

## COUNT VI
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

148.     Plaintiffs reassert and incorporate by reference all of the foregoing allegations in their entirety and further allege:

149.     Chenery and Hahn owed Plaintiffs fiduciary duties by virtue of their role as Plaintiffs' investment advisor.

150.     Sidley and Ruble owed Plaintiffs fiduciary duties by virtue of their attorney-client relationships with Plaintiffs.

151.     HVB knew that Chenery, Hahn, Sidley, and Ruble owed fiduciary duties to Plaintiffs.

152.     Chenery, Hahn, Sidley, and Ruble breached their fiduciary duties to Plaintiffs by failing to reveal material information, by concealing material information from Plaintiffs, by committing fraud, by failing to advise Plaintiffs of their conflicts of interest, by advising Plaintiffs to enter into the CARDS transaction, and by advising Plaintiffs to claim an inflated basis in the CARDS transaction.

33

153.     HVB knew or was generally aware that Chenery, Hahn, Sidley, and Ruble, were breaching their fiduciary duties to Plaintiffs.

154.     HVB knowingly provided substantial encouragement to Chenery, Hahn, Sidley, and Ruble Morris in the breach of their fiduciary duties by, inter alia, providing financing for the CARDS transaction.

155.     In aiding and abetting the other CARDS Promoters' breaches of fiduciary duty, HVB acted wantonly and with an evil mind.

156.     Plaintiffs are entitled to recover damages that reasonably flow from HVB aiding and abetting breaches of fiduciary duties, including, but not limited to, the CARDS transaction fees paid to the CARDS Promoters, the attorneys' and accountants' fees paid by all Plaintiffs in litigating against the IRS, back taxes and interest paid by Plaintiffs to the taxing authorities and such other and further damages as reasonably flow therefrom.

157.     Plaintiffs are also entitled to punitive damages in an amount to be determined at trial.

## COUNT VII
## NEGLIGENT SUPERVISION

158.     Plaintiffs reassert and incorporate by reference all of the foregoing allegations in their entirety and further allege:

159.     HVB owed Plaintiffs fiduciary duties by virtue of their role as Plaintiffs' lender, its superior knowledge of the CARDS transaction, the control HVB retained over Plaintiffs' accounts under the CARDS transaction and the trust and confidence that the Plaintiffs reposed in HVB.

160.     As Plaintiff's bank, HVB also owed Plaintiffs a duty to supervise its executives and employees.

161.     HVB intentionally, recklessly and/or negligently permitted a fraudulent tax strategy to be implemented. HVB also failed to properly supervise its employees and executives, including

Dominick DiGiorgio.  HVB negligently or intentionally failed to implement and maintain an effective program of supervision and control over Plaintiffs account investments and intentionally or otherwise negligently permitted a fraudulent tax strategy to be implemented.  Certainly the nature of the tax strategy implemented should have alerted HVB to the negligent supervision.

162.    As a result of HVB's failure to supervise its employees and executives, Plaintiffs were injured by implementing the CARDS Strategy.

163.    Plaintiffs are entitled to recover damages that reasonably flow from HVB's negligent supervision, including, but not limited to, the CARDS transaction fees paid to the CARDS Promoters, the attorneys' and accountants' fees paid by all Plaintiffs in litigating against the IRS, back taxes and interest paid by Plaintiffs to the taxing authorities and such other and further damages as reasonably flow therefrom.

164.    Plaintiffs are also entitled to punitive damages in an amount to be determined at trial based on HVB's gross negligence in failing to supervise employees and executives.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants as follows:

      A.      An award of damages in an amount to be proven at trial;

      B.      Punitive damages;

      C.      Treble damages, the costs incurred herein, and reasonable attorneys' fees ;

      D.      Pre and post judgment interest;

      E.      Attorneys' fees and costs;

      F.      For such other and further relief as the Court deems just and proper.

Dated:  November 4, 2013

Respectfully Submitted,

DONALD KIPNIS and LAWRENCE KIBLER

By: _Dennis G. Kainen_____
              One of their Attorneys

Dennis G. Kainen, Esq.
Weisberg & Kainen, P.L.
1401 Brickell Avenue, Suite 800
Miami, Florida 33131
(305) 374-5544
attorneys@weisbergandkainen.com

Of Counsel:

Michael G. Dickler
Scott F. Hessell
Sperling & Slater, P.C.
55 West Monroe Street, Suite 3200
Chicago, IL 60603
312.641.3200
mdickler@sperling-law.com
shessell@sperling-law.com