UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 13-23998-CIV-ALTONAGA/Simonton

**DONALD KIPNIS**, *et al.*,

    Plaintiffs,
v.

**BAYERISCHE HYPO-UND
VEREINSBANK, AG**, *et al.*,

    Defendants.
_____/

## ORDER

**THIS CAUSE** came before the Court upon Defendants, Bayerische Hypo-Und Vereinsbank, AG and HVB U.S. Finance, Inc.'s (collectively, "Defendants[']" or "HVB[']s]") Motion to Dismiss . . . ("Motion") [ECF No. 31]. Plaintiffs, Donald Kipnis ("Kipnis") and Lawrence Kibler ("Kibler"), submitted their Response . . . ("Response") [ECF No. 43] on January 31, 2014, to which Defendants filed a Reply . . . [ECF No. 46] on February 10, 2014. The Court has carefully reviewed the parties' written submissions, the record, and applicable law.

### I. BACKGROUND[1]

This case involves an income tax shelter scheme, known as a custom adjustable rate debt structure ("CARDS") transaction, promoted and sold to Plaintiffs by Defendants. (*See* Compl. ¶ 1). Plaintiffs are owners of Miller & Solomon General Contractors, Inc. ("M & S"), one of the largest general contractors in South Florida. (*See id.* ¶ 74). In 1999, after incurring a significant loss in connection with one of its construction projects, M & S found itself with a shortage of

---

[1] The allegations in Plaintiffs' Complaint [ECF No. 1], filed November 4, 2013, are taken as true.

working capital just as South Florida was entering a construction boom. (*See id.* ¶ 75). Plaintiffs tried unsuccessfully to secure financing for M & S through more conventional sources but were unable to do so. (*See id.*). Plaintiffs approached Merrill Lynch and Kipnis's father regarding a loan but were rebuffed by both parties. (*See id.*).

### A.  Plaintiffs Are Introduced to CARDS Transactions

In 2000, Michael DeSiato ("DeSiato"), Plaintiffs' and M & S's accountant, was introduced to Roy Hahn ("Hahn") of Chenery Associates, Inc. ("Chenery"), a financial and tax services boutique that promoted CARDS transactions. (*See id.* ¶¶ 33, 76). DeSiato told Plaintiffs a CARDS transaction could increase M & S's bonding capacity, while also providing added tax benefits that would flow to Plaintiffs. (*See id.* ¶¶ 75–76). In 2000, Chenery and Defendants began marketing the CARDS strategy to Plaintiffs. (*See id.* ¶ 50). Although "Plaintiffs analyzed the CARDS strategy to determine whether it would allow M & S to participate in more construction projects" (*id.* ¶ 76), neither Kibler nor Kipnis examined the various steps involved in CARDS, nor did Plaintiffs or DeSiato fully understand the complicated procedures involved in a CARDS transaction (*see id.* ¶ 77). Instead, Plaintiffs relied on the reputations of HVB and the law firm Sidley Brown & Wood LLP ("Sidley"); the latter had prepared an opinion letter representing the CARDS transaction was economically substantive and would pass the scrutiny of the Internal Revenue Service (the "IRS"). (*See id.* ¶¶ 77, 125).

### B.  CARDS Transactions, Generally

CARDS transactions and their providers, such as Defendants, have been the subject of investigation by federal authorities, including the IRS and the Department of Justice ("DOJ"). (*See id.*). A CARDS transaction is designed to create the appearance of a tax loss without there being any actual economic loss. (*See id.* ¶ 35). "A CARDS transaction has three phases: (1)

2

CASE NO. 13-23998-CIV-ALTONAGA/Simonton

[t]he loan origination phase; (2) the loan assumption phase; and (3) the operational phase." *Kerman v. Comm'r*, No. 15894-06, 2011 WL 839768, at *2 (T.C. Mar. 8, 2011) (alteration added). Generally, a CARDS transaction requires at least three parties: (1) a bank; (2) a borrower; and (3) and the assuming party, that is, the party that will typically claim the tax benefits. *See id.*

In the first phase of a CARDS scheme, a single purpose Delaware limited liability company ("LLC") is formed to serve as the borrower. (*See* Compl. ¶ 37). Importantly, the LLC is comprised entirely of foreign members so as to avoid U.S. tax liabilities. (*See id.* ¶¶ 36–37). Once formed, the LLC enters into "a euro denominated loan" with a foreign bank. (*Id.* ¶ 38). The LLC then purchases two certificates of deposit ("CD[s]") from the lending foreign bank with the loan proceeds. (*See id.*). One CD is purchased with a large portion of the loan proceeds, and the second CD is purchased with a much smaller portion of the proceeds. (*See id.*). The loan proceeds in the form of CDs are immediately pledged to the bank as collateral for the loan (*see id.*), at which point a CARDS customer purchases the smaller CD in exchange for his or her assumption of the full value of the loan and agreement to pay one-hundred percent of the loan principal when the loan reaches its maturation date (*see id.* ¶ 39). The CARDS customer next converts the smaller CD into a U.S. dollar denominated CD, which the customer gives to the lending institution as collateral for the loan. (*See id.*).

Theoretically, this currency exchange is a taxable event, purportedly generating tax benefits. (*See id.* ¶ 40). To achieve the benefits, the CARDS customer claims his or her basis in the currency exchange is the entire amount of the loan (not just the smaller portion actually received). (*See id.*). This discrepancy creates a tax loss equal to the value of the larger, undisbursed CD. (*See id.*). However, because both CDs held by the lender could and would be

3

used to repay the loan, the paper loss created by the currency exchange is completely illusory. (*See id.* ¶ 41). As a result, "[t]he IRS has vigorously pursued participants in CARDS transactions."[2] (*Id.* ¶ 61).

### C. The CARDS Transaction Between Plaintiffs and HVB

On October 11, 2000, two U.K. citizens, Elizabeth Sylvester and Michael Sherry, formed an entity identified as Wimbledon solely for Plaintiffs' CARDS transaction, for which Wimbledon would act as the borrower. (*See id.* ¶¶ 36, 78). On December 5, 2000, Wimbledon entered into a credit agreement with HVB. (*See id.* ¶ 78). As part of the credit agreement, HVB agreed to lend Wimbledon € 6,7000,000 over a thirty-year term, with interest accruing annually at a rate to be reset each year by HVB. (*See id.*). The same day, Wimbledon informed HVB it intended to borrow the € 6,7000,000 and requested the money be credited to its account, at which point Wimbledon issued a promissory note to HVB for € 6,7000,000, maturing on December 5, 2030, and HVB credited Wimbledon the same amount. (*See id.* ¶ 79). Wimbledon then entered into a master pledge and security agreement in favor of HVB, pledging all of Wimbledon's holdings at HVB as collateral. (*See id.*). Also on December 5, 2000, Wimbledon purchased an

---

[2] The IRS has issued several notices concerning CARDS transactions. On December 27, 1999, the IRS issued Notice 1999-59, titled "Tax Avoidance Using Distributions of Encumbered Property," warning certain transactions "being marketed to taxpayers for the purpose of generating tax losses" were not allowable for federal income tax purposes. (Compl. ¶ 53). In August 2000, the IRS issued a warning to taxpayers using tax shelters similar to CARDS, stating the purported tax benefits realized from those tax shelters would be subject to penalties. (*See id.* ¶ 54); *see also* I.R.S. Notice 2000-44, 2000-2 C.B. 255 (Aug. 13, 2000); *Gustashaw v. Comm'r*, 696 F.3d 1124, 1128 (11th Cir. 2012) (citation omitted). Nearly two years later, in March 2002, the IRS issued another notice to taxpayers, this time specifically targeted at the CARDS tax scheme. *See* I.R.S. Notice 2002-21, 2002-1 C.B. 730 (Mar. 18, 2002); *see also Gustashaw*, 696 F.3d at 1128 (citation omitted). On October 15, 2004, "the IRS issued a Coordinated Issue Paper on the CARDS facility, concluding again that the CARDS transaction lacked economic substance and that it was not allowable for federal income tax purposes." (Compl. ¶ 60). On October 28, 2005, the IRS announced a settlement initiative whereby CARDS customers could avoid certain tax penalties provided they relinquished their CARDS-related tax benefits and agreed to pay a reduced penalty. *See* I.R.S. Announcement 2005-08, 2005-2 C.B. 967 (Oct. 28, 2005); *see also Gustashaw*, 696 F.3d at 1128 (citation omitted).

CASE NO. 13-23998-CIV-ALTONAGA/Simonton

HVB time deposit in the amount of € 5,679,792, maturing on December 5, 2001. (*See id.*).

On December 21, 2000, Wimbledon and Plaintiffs "entered into a purchase agreement whereby Wimbledon sold each Plaintiff a portion of the credit facility in the form of a term deposit in the amount of € 520,500 (for a total of [€] 1,005,000), plus accrued interest, held in Wimbledon's pledged HVB account," which was transferred to Kibler and Kipnis's HVB account six days later. (*Id.* ¶ 80). As part of the purchase agreement, Plaintiffs assumed joint and several liability "for all obligations under the credit facility not covered by Wimbledon's collateral." (*Id.*). Also on December 21, 2000, Plaintiffs and Wimbledon entered into assumption agreements whereby Plaintiffs agreed to assume joint and several liability for the entire € 6,700,000 loan between Wimbledon and HVB. (*See id.* ¶ 81). As collateral, Plaintiffs pledged "all their rights, title, and interest in the deposit accounts, securities accounts, and other instruments and investment property held with HVB, as well as all proceeds thereof." (*Id.* ¶ 82).

"With these agreements in place, the three parties, Wimbledon (the borrower), HVB (the bank), and Kibler and Kipnis (the assuming parties), began taking a number of actions to execute the assumption of the credit facility." (*Id.* ¶ 83). On December 21, 2000, Kibler and Kipnis each wired $599,000 ($1,198,000 total) to HVB to purchase three time deposits that would mature on December 5, 2001. (*See id.*). Then, on December 27, 2000, HVB transferred the same € 1,005,000 referenced in the purchase agreement between Plaintiffs and Wimbledon into Plaintiffs' HVB account. (*See id.*). That same day, HVB exchanged € 733,750 of the € 1,005,000 it had credited to Plaintiffs for $682,387.50, at a rate of .93 dollars to the euro. (*See id.*). On January 11, 2001, HVB exchanged the remaining € 271,250 credited to Plaintiffs for $256,331.25, at a rate of .945 dollars to the euro. (*See id.*).

When Plaintiffs deposited the $1,198,000 with HVB, HVB allowed M & S to withdraw

5

CASE NO. 13-23998-CIV-ALTONAGA/Simonton

$1,037,680 in credit facility proceeds from the bank to use for whatever purposes M & S saw fit. (*See id.* ¶ 84). On January 11, 2001, Plaintiffs began using the proceeds from the credit facility by wiring $382,000 from their HVB account to an account held by Chenery, which used the funds to pay DeSiato, and by wiring $556,718.75 to M & S's account at Mellon Bank. (*See id.*).

On November 13, 2001, nearly a year after the initiation of the CARDS loan, HVB informed Plaintiffs that December 5, 2001 would be the mandatory repayment date. (*See id.* ¶ 85). On the repayment date, Plaintiffs' deposits at HVB were also converted to the euro at the December 22, 2000 exchange rate. (*See id.*). Had the dollars been converted to the euro according to the December 5, 2001 exchange rate, Plaintiffs would have made a profit of $70,200. (*See id.*). These borrowed funds were all repaid with the previously pledged collateral, so that no new capital contributions were ever made. (*See id.*).

In February 2006, HVB entered into a Deferred Prosecution Agreement ("DPA") with the DOJ, whereby HVB agreed to pay $29,635,125 to the United States, including a disgorgement of $16,195,999 for fees received from its tax shelter activities, restitution, and penalties. (*See id.* ¶ 69; Ex. 1 [ECF No. 1-2]). In the DPA, HVB admitted its employees engaged in fraudulent conduct through their participation in fraudulent tax shelter transactions, including CARDS, and by preparing false documents as part of the underlying tax shelters. (*See id.* ¶ 70). Considering the admissions contained in the DPA, the CARDS strategy could never have withstood IRS scrutiny. (*See id.* ¶ 19).

The IRS eventually notified Plaintiffs the CARDS transaction they had engaged in lacked economic substance and the tax benefits claimed by Plaintiffs in 2000 and 2001 were being disallowed. (*See id.* ¶¶ 4, 8, 95). Plaintiffs challenged the IRS determination, and on November 1, 2012, the United States Tax Court issued a ruling against Plaintiffs, requiring them to pay

CASE NO. 13-23998-CIV-ALTONAGA/Simonton

significant tax liabilities and interest.  (*See id.* ¶¶ 8, 95).

### D.  HVB's Allegedly Wrongful Conduct

According to Plaintiffs, HVB knew the purported tax loopholes it was exploiting through the CARDS transactions would not withstand IRS scrutiny.  (*See id.* ¶ 12).  In fact, the CARDS transactions were "nothing more than illegal tax shelters, which were developed and implemented by Chenery and HVB for the sole purpose of generating unconscionable fees." (*Id.* ¶ 17).  Plaintiffs allege HVB conspired with Sidley; Chenery; Hahn; Raymond J. Ruble ("Ruble"); Dewey & LeBoeuf LLP ("LeBoeuf"); and Graham Taylor ("Taylor") (collectively, the "CARDS Dealers"), to perpetuate the fraudulent tax shelter scheme.  (*See id.* ¶ 6).  HVB and its employees, along with Sidley and Chenery, conspired to perpetrate a tax fraud scheme on thousands of their clients, including Plaintiffs.  (*See id.* ¶ 11).  As a result of this alleged conspiracy, Plaintiffs were induced to enter a CARDS transaction based on the reputations of the CARDS Dealers involved, including HVB.  (*See id.* ¶¶ 19, 25).

HVB allegedly "owed Plaintiffs fiduciary duties by virtue of their [sic] role as Plaintiffs' lender, its superior knowledge of the CARDS transaction, the control HVB retained over Plaintiffs' accounts . . . and the trust and confidence that the Plaintiffs reposed in HVB."  (*Id.* ¶ 142).  According to Plaintiffs, HVB violated these purported fiduciary duties by concealing and failing to reveal information from Plaintiffs, and by committing fraud against Plaintiffs.  (*See id.* ¶ 145).  Likewise, HVB knowingly provided substantial encouragement to the CARDS Dealers, aiding the CARDS Dealers to defraud Plaintiffs.  (*See id.* ¶¶ 151–154).

Plaintiffs now seek to recoup their damages from HVB, including the CARDS transaction fees paid to HVB and other CARDS Dealers, Plaintiffs' attorneys' and accountants' fees incurred in litigating against the IRS, back taxes and interest paid by Plaintiffs, punitive

damages, treble damages, and the attorneys' fees and costs associated with bringing this action. (*See id.* ¶¶ 112, 114, 122–123, 130, 146–147, 156–157, 163–164). The Complaint contains the following causes of action: Count I for violation of the Florida Civil Racketeer Influenced and Corrupt Organization ("RICO") statute and its accompanying Civil Remedies for Criminal Practices Act (the "CRCPA"), Florida Statute section 772.17; Count II for common law fraud; Count III for aiding and abetting fraud; Count IV for civil conspiracy; Count V for breach of fiduciary duty; Count VI for aiding and abetting breach of fiduciary duty; and Count VII for negligent supervision. (*See generally* Compl.). Defendants' Motion seeks dismissal of the Complaint in its entirety on the basis the claims are time-barred and fail to state claims for relief. (*See generally* Mot.).

## II.  LEGAL STANDARD

"To survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (alteration added) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (quoting *Twombly*, 550 U.S. at 555). Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

Generally, the question of whether a claim is barred by the statute of limitations is best raised as an affirmative defense in the answer, rather than in a motion to dismiss. *See Spadaro v.*

CASE NO. 13-23998-CIV-ALTONAGA/Simonton

*City of Miramar*, 855 F. Supp. 2d 1317, 1328 (S.D. Fla. 2012) (citing *Cabral v. City of Miami Beach*, 76 So. 3d 324, 326 (Fla. 3d DCA 2011)).  Nevertheless, "[a]t the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute."  *Lindley v. City of Birmingham, Ala.*, 515 F. App'x 813, 815 (11th Cir. 2013) (alterations in original) (quoting *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n.13 (11th Cir. 2005)).

### III.  ANALYSIS

Defendants argue this action is barred by the statutes of limitations applicable to each of Plaintiffs' claims.  (*See* Mot. 9–10).  Defendants also assert, regardless of the discovery rule governing the timeliness of Plaintiffs' fraud-based claims, the twelve-year statute of repose bars Plaintiffs' fraud-based claims.  (*See id.* 10).  Assuming Plaintiffs' claims are timely-filed, Defendants maintain the Complaint should be dismissed as Plaintiffs have not sufficiently alleged: a civil RICO claim in Count I (*see id.* 16–17); reasonable reliance in Counts I, II, and III (*see id.* 14–16); the fraud-based claims with particularity (*see id.* 18–20); and a duty owed by Defendants to Plaintiffs in Counts V and VII (*see id.* 17–18).

Plaintiffs insist their claims are timely under the applicable statutes of limitations and the twelve-year statute of repose for fraud-based claims.  (*See* Resp. 5–10).  Additionally, Plaintiffs take issue with Defendants' impermissible reliance on documents neither attached to the Complaint nor central to the case in advancing the time-bar defense.  (*See id.* 4–5).  Plaintiffs also maintain they have properly stated a Florida RICO claim in Count I (*see id.* 12–14), Florida law does not require them to allege reasonable reliance in order to state a claim for fraud (*see id.* 10–12), they have pleaded their fraud claims with particularity (*see id.* 16–19), and they have sufficiently alleged the existence of a fiduciary duty between themselves and Defendants (*see id.*

9

CASE NO. 13-23998-CIV-ALTONAGA/Simonton

14–16). As the Court finds Plaintiffs' claims are barred by the applicable statutes of limitations, the Court does not address the other arguments.

Pursuant to Florida law, there is a four-year statute of limitations for "[a]n action founded on negligence" FLA. STAT. § 95.11(3)(a), "[a] legal or equitable action founded on fraud" *id.* § 95.11(3)(j), and "[a]ny action not specifically provided for in these statutes" *id.* § 95.11(3)(p). The statute of limitations for a civil RICO claim under the CRCPA is five years. *See id.* § 772.17. Absent certain exceptions, such as equitable tolling or delayed discovery, "the time within which an action shall be begun under any statute of limitations runs from the time the cause of action accrues." *Id.* § 95.031. "A cause of action accrues when the last element constituting the cause of action occurs." *Id.* § 95.031(1).

"The last element constituting a cause of action for negligence or breach of fiduciary duty is the occurrence of damages."[3] *Kelly v. Lodwick*, 82 So. 3d 855, 857 (Fla. 4th DCA 2011) (citations omitted). "[A] conspiracy cause of action in Florida accrues when the plaintiff suffers damages performed pursuant to the conspiracy."[4] *Bloom v. Alvereze*, 498 F. App'x 867, 876 (11th Cir. 2012) (citation and internal quotation marks omitted). For an action based on fraudulent conduct, the claim begins to accrue when the facts giving rise to the claim were

---

[3] Pursuant to Florida law, "[t]he elements of a claim for breach of a fiduciary duty are: the existence of a fiduciary duty, and the breach of that duty such that it is the proximate cause of the plaintiff's damages." *Gracey v. Eaker*, 837 So. 2d 348, 353 (Fla. 2002) (footnote call number omitted). To state a claim for negligence in Florida, the traditional elements of duty, breach, causation, and damages must be properly pleaded. *See Clay Elec. Co-op., Inc. v. Johnson*, 873 So. 2d 1182, 1185 (Fla. 2003) (citation omitted).

[4] "A civil conspiracy requires: (a) an agreement between two or more parties, (b) to do an unlawful act or to do a lawful act by unlawful means, (c) the doing of some overt act in pursuance of the conspiracy, and (d) damage to [the] plaintiff as a result of the acts done under the conspiracy." *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So. 2d 1157, 1159–60 (Fla. 3d DCA 2008) (alteration added; citations omitted).

discovered or should have been discovered through the exercise of due diligence.[5] *See* FLA. STAT. § 95.031(2)(a); *see also Becnel v. Deutsche Bank, AG*, 507 F. App'x 71, 73 (2d Cir. 2013) (citing FLA. STAT. § 95.031(2)(a)). Similarly, "[a] civil RICO action begins to accrue as soon as the plaintiff discovers, or reasonably should have discovered, both the existence and source of his injury and that the injury is part of a pattern." *McCaleb v. A.O. Smith Corp.*, 200 F.3d 747, 751 (11th Cir. 2000) (citation and internal quotation marks omitted).[6] Lastly, in Florida, "[t]he discovery rule delays the accrual of a cause of action until the happening of an event likely to put the plaintiff on notice of the existence of a cause of action." *Thomas v. Lopez*, 982 So. 2d 64, 67 (Fla. 4th DCA 2008) (citation omitted).

Plaintiffs allege they were injured by actions occurring between October 2000 and December 5, 2001, the date of the last action taken on their CARDS transaction. The allegations in their Complaint, broadly construed, are that a general pattern of fraudulent conduct by HVB continued into 2003. Plaintiffs admit "HVB's last act in furtherance of the [alleged] tax shelter conspiracy" occurred in 2003. (Resp. 10). On these facts, Plaintiffs' claims are clearly time-barred unless Plaintiffs could not have reasonably discovered the underlying facts giving rise to their various claims until some later date.[7] But Plaintiffs include no such allegation in their

---

[5] To properly state a claim for fraud pursuant to Florida law, a plaintiff must plead: "1) a false statement concerning a specific material fact; 2) the speaker's knowledge that the representation is false; 3) an intention that the representation induces another's reliance; and 4) consequent injury to the other party acting in reliance on the representation." *Democratic Republic of the Congo v. Air Capital Group, LLC*, No. 12-20607-CIV, 2013 WL 3223686, at *4 (S.D. Fla. June 24, 2013) (citation omitted).

[6] As Florida's civil RICO statute, the CRCPA, is modeled after federal law, its interpretation is informed by case law interpreting the federal RICO statute. *See Jackson v. Bellsouth Telecomms.*, 372 F.3d 1250, 1263–64 (11th Cir. 2004) (citations omitted).

[7] Although Plaintiffs have explained they "do not rely on the discovery rule or other methods of equitable tolling that are available to them" (Resp. 9 n.4), the moment Plaintiffs discovered or should have discovered the facts giving rise to their claims is pivotal in determining the timeliness of Plaintiffs' fraud-based claims and civil RICO claim. As the legal analysis applicable to Plaintiffs' fraud-based counts and

pleading and make no such argument.

Plaintiffs allege on November 13, 2011 they were notified by HVB that repayment of the full loan amount was due on December 5, 2001, thus concluding the CARDS transaction. (*See* Compl. ¶ 85). This occurred despite the CARDS Dealers' earlier representations "HVB intended to maintain the loans for 30 years." (*Id.* ¶ 107; *see also id.* ¶ 125). At this point, a reasonably diligent party would have been compelled to explore the nature of this discrepancy, including the possibility of fraud and conspiracy. As the Eleventh Circuit approvingly noted from the district court's decision in *Curtis Inv. Co. v. Bayerische Hypo-und Vereinsbank, AG*, 341 F. App'x 487, 496 (11th Cir. 2009), a factually similar case involving a CARDS transaction and one of the same Defendants and some of the same players as participated in the CARDS transaction at issue here, "once [the plaintiff] was notified by HVB that it was demanding repayment of the loan in full after only one year, the difference between the alleged representations made by defendants and the terms of the Credit Agreement could not have been more explicit, and any reasonable party would have been prompted to investigate both the possibility of fraud and conspiracy." (alteration added).

Further, HVB entered into the DPA with the IRS and DOJ in February 2006. In the DPA, HVB admitted to participating in fraudulent tax shelter schemes, including CARDS transactions, in order to generate transaction fees. (*See* Compl. ¶¶ 69–71). Kibler and Kipnis were both notified by the IRS that the CARDS transaction they had engaged in lacked economic substance and the tax benefits Plaintiffs were requesting were being disallowed. (*See id.* ¶¶ 8, 95). Both Plaintiffs filed petitions in the tax court on December 31, 2007, after receiving IRS

---

civil RICO count mirrors the discovery rule, and each of Plaintiffs' claims arises from the same wrongful conduct alleged in those counts, the Court's analysis assumes the applicability of the discovery rule to Plaintiffs' claims.

CASE NO. 13-23998-CIV-ALTONAGA/Simonton

Notices of Deficiency dated October 4, 2007 for their 2000 and 2001 tax filings.[8] *See Kipnis v. Comm'r*, No. 30370-07, 2007 WL 7752435 (T.C. Dec. 31, 2007) (Petition); *Kibler v. Comm'r*, No. 30373-07, 2007 WL 7752434 (T.C. Dec. 31, 2007) (Petition). The IRS Notices of Deficiency should also have put Plaintiffs on notice of the potentially fraudulent nature of the CARDS transactions. By the exercise of due diligence, Plaintiffs should have learned of the DPA and HVB's fraudulent conduct no later than December 31, 2007.[9] By that point, the various IRS notices regarding tax shelters and CARDS transactions, the DPA, and the IRS Notices of Deficiency should have alerted Plaintiffs, through the exercise of due diligence, to all of the facts giving rise to Plaintiffs' claims in this lawsuit, including that the various transaction fees Plaintiffs paid to HVB and the other CARDS Dealers were wrongfully obtained. Consequently, Plaintiffs had until December 31, 2011 to timely file their fraud-based claims.

Similarly, Plaintiffs' civil conspiracy, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and negligent supervision claims arise from the same nucleus of facts as Plaintiffs' fraud-based claims. Employing a liberal application of the discovery rule to the remainder of Plaintiffs' claims, Plaintiffs should have discovered the facts giving rise to those claims by December 31, 2007, and would have needed to file those claims no later than

---

[8] Although a district court must generally convert a motion to dismiss into a motion for summary judgment if the court considers materials outside the complaint, "[a] district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment[ and] [p]ublic records are among the permissible facts that a district court may consider." *Universal Express, Inc. v. S.E.C.*, 177 F. App'x 52, 53 (11th Cir. 2006) (alterations added; citations omitted). Plaintiffs have referenced the petitions in their Complaint (*see* Compl. ¶¶ 8, 95), and neither party can seriously dispute the authenticity of these public documents — indeed, counsel for Plaintiffs authored the petitions. Thus, the Court takes judicial notice of the dates Plaintiffs filed their petitions with the IRS, and the dates on the IRS Notices of Deficiency received by Plaintiffs.

[9] Plaintiffs do not allege when they received the Notices of Deficiency. Yet, it is clear Plaintiffs must have received their Notices of Deficiency no later than December 31, 2007 — the date Plaintiffs filed their petitions with the tax court.

13

December 31, 2011. Plaintiffs' Florida civil RICO claim also accrued no later than December 31, 2007, as the admissions contained in the DPA should have put Plaintiffs on notice that HVB was the source of any alleged injury, the CARDS transaction Plaintiffs participated in with HVB was a sham, and HVB engaged in numerous tax shelter schemes through 2003. Applying the five-year statute of limitations from the December 31, 2007 accrual date, Plaintiffs had until December 31, 2012 to file their Florida civil RICO claim. Plaintiffs did not file their Complaint until November 4, 2013. As a result, each of the claims is time-barred.

Plaintiffs nevertheless argue they did not sustain any damages until November 1, 2012, when the tax court issued its final judgment against them, and so their claims did not accrue until that date. (*See* Resp. 5). But in Florida, "the cause of action accrues immediately upon the first injury caused by another's wrongful act, even though related injuries may later manifest themselves." *Workman v. R.J. Reynolds Tobacco Co.*, No. 08-80029-CIV, 2008 WL 2219803, at *1 (S.D. Fla. May 28, 2008) (citing *City of Miami Beach v. Brooks*, 70 So. 2d 306, 308 (Fla. 1954) ("[W]here an injury, although slight, is sustained in consequence of the wrongful act of another, and the law affords a remedy therefor, the statute of limitations attached at once . . . . [T]he running of the statute is not postponed by the fact that the actual or substantial damages do not occur until a later date.")); *see also Hynd v. Ireland*, 582 So. 2d 772, 773 (Fla. 4th DCA 1991) (applying Florida's first injury rule to an action for fraud).

The Complaint alleges HVB and the other CARDS Dealers promoted the transactions "for the sole purpose of generating unconscionable fees . . . ." (Compl. ¶ 17; *see also id.* ¶¶ 6, 12, 52). Plaintiffs allege they paid these "significant fees to the CARDS Dealers" (*id.* ¶ 26), and they "have been damaged [by these] substantial fees . . . made to [HVB] and the other CARDS Dealers" (*id.* ¶ 96). Although Plaintiffs avoid pleading the precise date the fees were paid to

CASE NO. 13-23998-CIV-ALTONAGA/Simonton

HVB anywhere in the thirty-six page Complaint, the fees would have been paid no later than December 5, 2001 — Plaintiffs' mandatory repayment date (*see id.* ¶ 85). And in any event, Plaintiffs have pleaded they paid "$382,000 from their HVB account to an account held by Chenery as promoter of the CARDS transaction" (*id.* ¶ 84), and they lost potential profits of $70,200 on the December 5, 2001 currency exchange (*see id.* ¶ 85). Thus, by December 5, 2001, Plaintiffs had sustained a portion of the damages they now seek to recover.

In response to the legal implications of the foregoing date of some of their losses, Plaintiffs rely on the Florida Supreme Court's decision in *Peat, Marwick, Mitchell & Co. v. Lane*, 565 So. 2d 1323 (Fla. 1990). (*See* Resp. 5). According to Plaintiffs, the *Peat, Marwick* decision leaves no doubt that Plaintiffs' claims did not accrue until the tax court issued its ruling in 2012. (*See id.* 6). In *Peat, Marwick*, the court resolved the narrow question of "whether the commencement of the limitations period in an accounting malpractice action relating to income tax preparation occurs with the receipt of a 'Ninety-Day Letter' or with the conclusion of the appeals process, under circumstances where the accountant disagrees with the IRS's determination." *Peat, Marwick*, 565 So. 2d at 1325. The court specifically held, "under the circumstances of this case, *where the accountant did not acknowledge error*, the limitations period for *accounting malpractice* commenced when the United States Tax Court entered its judgment." *Id.* at 1327 (emphasis added). In the context of a professional malpractice action, the holding of *Peat, Marwick* is quite persuasive, since the harm sustained by the client/plaintiff is entirely "hypothetical and damages are speculative" until the outcome of the underlying action is determined. *Silvestrone v. Edell*, 721 So. 2d 1173, 1175 (Fla. 1998).

Under the present circumstances, the rule pronounced in *Peat, Marwick* is much less persuasive, and the case is wholly distinguishable. Defendants are not accountants, nor do

15

Plaintiffs assert a claim for professional malpractice. Moreover, the decision in *Peat, Marwick* turned on the parties' shared belief the advice given by the tax accountant was correct. As the court articulated, "[u]ntil the tax court determination, both the [plaintiffs] and [defendants] believed that the accounting advice was correct; consequently, there was no injury." *Peat, Marwick*, 565 So. 2d at 1326 (alterations added). In stark contrast to the accountant in *Peat, Marwick* who denied committing malpractice, HVB admitted to receiving fees from 1996 through 2003 for its participation in a number of fraudulent tax shelter schemes, including CARDS. (*See* Compl. ¶¶ 69–71). HVB admitted the wrongful nature of its conduct in February 2006, in the DPA, which Plaintiffs themselves attach to the Complaint, and which states upon the filing of the criminal information against HVB, the DPA, including its statement of facts, will be filed publicly in the proceedings in the United States District Court for the Southern District of New York.[10] (*See* Compl. Ex. 1 ¶ 19). After HVB executed the DPA, Plaintiffs and HVB were clearly in disagreement over the viability of CARDS, and any belief held by Plaintiffs regarding the economic substance of the CARDS strategy was inconsistent with HVB's publicly stated position.

Plainly, these circumstances distinguish this case from *Peat, Marwick*. The Court does not agree the holding of *Peat, Marwick* is as far-reaching as Plaintiffs would have the Court believe. As later explained by the Florida Supreme Court,

> *Peat, Marwick* does not articulate a rule that the running of the statute of limitations for professional malpractice is held in abeyance until the conclusion of any collateral litigation in which the client might assert a position inconsistent

---

[10] Plaintiffs do not allege when they became aware of the DPA. But as previously explained, the IRS Notices of Deficiency dated October 4, 2007, clearly put Plaintiffs on notice concerning the potential inadequacy of the CARDS strategy. Through the exercise of due diligence, Plaintiffs should have soon discovered the various IRS notices regarding CARDS and the DPA — all of which are readily available to the public.

> with the malpractice claim. Such a rule could not be reconciled with the commencement point — "the time the cause of action is discovered or should have been discovered" — established in section 95.11(4)(a).

*Larson & Larson, P.A. v. TSE Indus., Inc.*, 22 So. 3d 36, 44 (Fla. 2009). The Complaint, the documents incorporated into the Complaint, and the documents in the public record and attached to the Complaint indicate any potential cause of action should have been discovered, at the latest, when Plaintiffs received notice from the IRS sometime between October 4, 2007 and December 31, 2007. *See Kottler v. Deutsche Bank AG*, 607 F. Supp. 2d 447, 460–61 (S.D.N.Y. 2009) (granting the defendants' motion to dismiss the plaintiffs' fraud, conspiracy to commit fraud, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and RICO claims as time-barred where one of the plaintiffs had received a tax bill from the IRS disallowing a tax scheme similar to CARDS); *Kerman v. Chenery Assocs., Inc.*, No. 3:06CV-338-S, 2011 WL 1106736, at *6 (W.D. Ky. Mar. 23, 2011) ("Thus in December 2001 when the CARDS loan was called and [plaintiffs] knew they had lost the investment and associated tax advantages they hoped to gain, they had a duty to investigate potential claims for their injuries.") (alteration added); *see also Sid Richardson Carbon & Gasoline Co. v. Interenergy Res., Ltd.*, 99 F.3d 746, 755 (5th Cir. 1996) ("Under Texas law, a cause of action predicated on tax liability does not accrue until the IRS issues a formal notice of deficiency."); *Khan v. Deutsche Bank AG*, 978 N.E. 2d 1020, 1036–37 (Ill. 2012) (concluding plaintiff investors' claims for fraud, negligence, and breach of fiduciary duty against investment bank accrued under the discovery rule when the IRS first issued its informal notice of deficiency to the plaintiffs); *McMahan v. Deutsche Bank AG*, 938 F. Supp. 2d 795, 802 (N.D. Ill. 2013) (applying *Khan*).

Plaintiffs further rely on the Florida Supreme Court's decision in *Blumberg v. USAA Casualty Insurance Co.*, 790 So. 2d 1061 (Fla. 2001), to bolster the argument their claims did not

17

accrue until the tax court issued its decision. (*See* Resp. 7–8). In *Blumberg*, the court revisited *Peat, Marwick*, explaining, "[t]he logic behind the *Peat, Marwick* decision was that a client should not be forced to bring a claim against an accountant prior to the time that the client incurred damages. A rule that would mandate simultaneous suits would hinder the defense of the underlying claim and prematurely disrupt an otherwise harmonious business relationship." *Blumberg*, 790 So. 2d at 1065. Here, any business relationship between Plaintiffs and HVB was concluded in December 2001, when the CARDS transaction was terminated. And whatever residual relationship, if any, remained between the parties, could not be termed "harmonious" after the admissions in the DPA, a public record, came to light.

Further distinguishing this case from *Peat, Marwick* and *Blumberg*, Plaintiffs would not be required to take directly contrary positions in simultaneously challenging the IRS deficiency determination and filing suit against HVB. In a tax liability malpractice case, a tax court's finding that an IRS determination of a tax deficiency is inappropriate would bar a claim against the lawyers or accountants who provided the allegedly negligent tax services. *See Larson & Larson, P.A.*, 22 So. 3d at 44 ("[A] cause of action for legal malpractice does not accrue until the underlying legal proceeding has been completed on appellate review because, until that time, one cannot determine if there was any actionable error by the attorney." (quoting *Peat, Marwick*, 565 So. 2d at 1325)). In such cases, the district court's determination of a claim against the petitioner's tax advisors for professional negligence is inextricably intertwined with the tax court's determination regarding any alleged tax deficiency. Here, whether HVB and the other CARDS Dealers engaged in a conspiracy to commit fraud against Plaintiffs in breach of HVB's alleged fiduciary duty is not legally dependent on a finding by the tax court that the CARDS transactions at issue lacked economic substance. And regardless, HVB publicly admitted the

CASE NO. 13-23998-CIV-ALTONAGA/Simonton

CARDS transactions lacked economic substance in the DPA over eight years ago. As such, *Peat, Marwick* and *Blumberg* are inapposite. For the reasons discussed, Plaintiffs' claims are time-barred.

## IV. CONCLUSION

Based on the foregoing, it is

**ORDERED AND ADJUDGED** that Defendants' Motion **[ECF No. 31]** is **GRANTED**. Plaintiffs' Complaint is **DISMISSED**. The Clerk is instructed to mark the case as **CLOSED**, and any pending motions are **DENIED as moot**.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 3rd day of April, 2014.

_____
**CECILIA M. ALTONAGA**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record