# Exhibit 2

## (Kipnis Deposition Transcript Excerpts)

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA


CASE NO.:  13-23998-CIV-ALTONAGA/GOODMAN


DONALD KIPNIS, et al.,

              Plaintiffs,

vs.

BAYERISCHE HYPO-UND VEREINSBANK,
AG, et al.,

              Defendants.
_____/


                      1441 Brickell Ave.
                      Suite 1420
                      Miami, Florida
                      Friday, October 6, 2017
                      9:36 a.m. - 4:28 p.m.


VIDEOTAPED DEPOSITION OF

DONALD KIPNIS


Taken on behalf of the Defendants before

Gina Rodriguez, RPR, CRR, Notary Public in and for the State

of Florida at Large, pursuant to Notice of Taking Videotaped

Deposition filed in the above cause.

```
 1   APPEARANCES:

 2

 3   On behalf of Plaintiffs:
          SPERLING & SLATER, P.C.
 4        55 West Monroe Street
          Suite 3200
 5        Chicago, Illinois 60603
          (312)641-3200
 6        BY:  DEREK J. LINKOUS, ESQUIRE
          dlinkous@sperling-law.com
 7

 8
     On behalf of Defendants:
 9        KASOWITZ BENSON TORRES, LLP
          1399 New York Avenue
10        Suite 201
          Washington, DC 20005
11        (202)760-3403
          BY:  HENRY BROWNSTEIN, ESQUIRE
12        hbrownstein@kasowitz.com

13

14   ALSO PRESENT:  Christian Hernandez, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

Page 23

1   BY MR. BROWNSTEIN:

2       Q.   What was your salary as executive director

3   of construction at The Trump Group?

4       A.   I don't remember, sitting here today.

5       Q.   Do you have a ballpark range in mind?

6       A.   No.

7       Q.   Was it over $200,000?

8       A.   I don't remember.

9       Q.   Was it under $200,000?

10      A.   I don't remember.

11      Q.   Did you receive other forms of compensation

12  other than salary while you were executive director

13  of construction at The Trump Group?

14          MR. LINKOUS:  Objection to foundation.

15          You can answer.

16      A.   Yes.

17  BY MR. BROWNSTEIN:

18      Q.   What other forms of compensation did you

19  receive?

20      A.   A profits interest in two future projects.

21      Q.   And what were the names of those -- what

22  are the names of those projects?

23      A.   Luxuria and Mansions at Acqualina.

24      Q.   Do you still have those profit interests?

25      A.   No.

1        Q.    What happened to those profit interests?

2             MR. LINKOUS:  Objection, vague.

3        A.    I gave --

4             MR. LINKOUS:  Objection, vague and

5        ambiguous.

6             You can answer.

7             THE WITNESS:  Sorry about that.

8        A.    I gave them up as assets in my bankruptcy

9    when it was accepted by the bankruptcy agreement.

10   BY MR. BROWNSTEIN:

11       Q.    You received your profit interest while you

12   were at The Trump Group, correct?

13       A.    Yes.

14       Q.    And do you recall specifically within that

15   2 1/2 year time frame when you received the profit

16   interest?

17       A.    Not specifically.

18       Q.    Suffice it to say you had them as of

19   some -- when the time you left -- at the time you

20   left The Trump Group?

21       A.    Yes.

22       Q.    Do you recall when you assigned your -- the

23   profit interests in connection with the bankruptcy

24   settlement?

25             MR. LINKOUS:  Objection to form and

1       foundation.

2            You can answer.

3       A.   Not sitting here at this time.

4  BY MR. BROWNSTEIN:

5       Q.   Was it sometime in this last year?

6       A.   No.

7       Q.   Was it in 2016?

8       A.   I don't know.

9       Q.   Between -- whenever that was, between the

10 time you acquired the profit interest to the time you

11 assigned them, had you received any profits from the

12 Luxuria or the Acqualina properties?

13      A.   Some money was paid.

14      Q.   How much money was paid?

15      A.   I don't know, sitting here at this time.

16      Q.   Who would know?

17           MR. LINKOUS:  Object to the extent it calls

18      for speculation.

19           You can answer.

20      A.   Trump Group.

21 BY MR. BROWNSTEIN:

22      Q.   Were those profit interests paid, to your

23 knowledge, when you were at The Trump Group?

24      A.   I believe so.

25      Q.   From the time you left Trump Group to the

Page 26

1    time you assigned the asset, meaning your profit

2    interests, had you received any profits from the

3    Luxuria or Acqualina properties?

4         A.   Not that I'm aware of.

5         Q.   Do you know why you didn't receive profit

6    interests from 2000 -- from the time you left Trump

7    Group to the time you assigned it, assigned the

8    asset?

9         A.   Yes.

10        Q.   Why?

11        A.   Because I wasn't working there anymore.

12        Q.   So you no longer had the right to receive

13   profit interests after you left Trump Group?

14             MR. LINKOUS:  Object to the extent it calls

15        for a legal conclusion.

16             You can answer.

17        A.   I'm not sure why The Trump Group stopped

18   paying me profits interests.

19   BY MR. BROWNSTEIN:

20        Q.   And you assigned that -- do you know what

21   value that asset has -- had when you assigned it in

22   connection with your bankruptcy?

23        A.   No.

24        Q.   Do you believe it had any value at the time

25   you assigned it?

Page 27

1      A.   Yes.

2      Q.   And what value did you believe it had?

3           MR. LINKOUS:  Objection, asked and

4      answered.

5           You can answer.

6      A.   It's impossible to know because Mansions at

7  Acqualina had not been built and sold.  So how could

8  I know what the profit is?

9           I didn't mean to ask a question with a

10  question -- answer a -- it's impossible to know the

11  profit if the deal isn't over.

12     Q.   Is the deal over for Acqualina today?

13     A.   I don't think so.

14     Q.   And what do you mean by the deal being

15  over?

16     A.   The profits interest required all units to

17  be sold.

18     Q.   So it's -- is it your understanding that

19  not all of the units at Acqualina have been sold

20  today -- to date?

21     A.   Yes.

22     Q.   And how about the Luxuria?  Is it your

23  understanding that all the units of Luxuria have not

24  been sold today?

25     A.   I don't know the status of Luxuria.

Page 28

1       Q.   At the time that you had assigned it, did
2   you know the status of Luxuria?
3       A.   No.
4       Q.   Had all of the units been sold at the time
5   you assigned your rights to profit interest in the
6   Luxuria?
7       A.   I don't know.
8       Q.   Do you know why you did receive profit
9   interests while you were at The Trump Group but
10  not -- not all of the units had been sold?
11          MR. LINKOUS:  Objection, vague and
12      ambiguous.
13          You can answer if you understand the
14      question.
15      A.   Yes.
16  BY MR. BROWNSTEIN:
17      Q.   Why?
18      A.   It was a method that Trump Group used to
19  provide me overall compensation.
20      Q.   What do you mean by, "It was a method that
21  Trump Group used"?
22      A.   What I mean is that there are different
23  ways to compensate people.  Sometimes there are stock
24  options, sometimes there's profit sharing in addition
25  to a base salary.

Page 49

1    BY MR. BROWNSTEIN:

2        Q.    If you look down halfway down the page,

3    project name is NSU Library.  Do you see that?

4        A.    Yes.

5        Q.    And that was one of Miller & Solomon's

6    projects?

7        A.    That's what this says.

8        Q.    I'm asking you if that was just -- if it

9    was a project.

10       A.    Yes.

11       Q.    It was a project?

12       A.    Yes.

13       Q.    Okay.  Did Miller & Solomon obtain a

14   bond -- a construction bond for the NSU Library?

15       A.    This says it did.

16       Q.    I know that it says it did.  I'm asking you

17   if Miller & Solomon obtained a construction bond for

18   NSU Library.

19       A.    I don't remember, sitting here at this

20   time.

21       Q.    Okay.

22       A.    That was 17 years ago.  If -- what the date

23   says here.

24       Q.    Do you have any reason to believe that

25   Hartford did not issue Miller & Solomon a roughly

Page 59

```
 1        A.   Yes.

 2        Q.   Do you see, going down, there's an entry

 3   for total current liabilities for 2000 in the amount

 4   of roughly $8.4 million?

 5        A.   Yes.

 6        Q.   Are you still not able to tell me how to

 7   determine net quick on Miller & Solomon's net quick

 8   for the year -- as of December 31, 2000?

 9             MR. LINKOUS:  Objection.  Asked and

10        answered, as well as argumentative.

11             You can answer.

12        A.   No.  How?

13   BY MR. BROWNSTEIN:

14        Q.   I get to ask the questions.

15             Would you say that net quick was critical

16   to Miller & Solomon's business?

17             MR. LINKOUS:  Objection, vague and

18        ambiguous.

19             You can answer.

20        A.   Yes.

21   BY MR. BROWNSTEIN:

22        Q.   Were you able to determine what Miller &

23   Solomon's net quick was in 2000?

24        A.   I would think so.

25        Q.   And you're -- you're just not able to tell
```

Page 63

 1   loan?

 2        A.   I don't remember how it was contributed,

 3   sitting here at this time.

 4        Q.   Okay.  If you take a look at the schedule,

 5   to the audited financial statement of Miller &

 6   Solomon, which is on the last page.

 7             Are you familiar -- are you familiar with

 8   the information -- are you familiar with this

 9   schedule?

10        A.   I'm not familiar with this schedule.

11        Q.   There's a page 3 of 14, which is, I guess,

12   the second-to-last page.  Are you familiar with that

13   schedule, which is entitled:  "Schedule of contracts

14   completed year ended December 31, 2001"?

15        A.   No.  I know what it is, I can read what it

16   is, but I'm not familiar with it.  It is 17 years

17   old.

18        Q.   Do you have any reason to believe that the

19   information set forth on the schedule that's page 414

20   is not accurate?

21             MR. LINKOUS:  Object to form and

22        foundation.

23             You can answer.

24        A.   No, not sitting here at this time.

25             MR. BROWNSTEIN:  Okay, if you want to take

Page 65

1          Q.   And that's roughly 11 years after you

2     engaged in your CARDS transaction, right?

3          A.   Roughly.

4          Q.   Could you please turn to page 132.

5               You understood that your -- you provided

6     testimony in that case, correct?

7          A.   Yes.

8          Q.   And you understood that you were under

9     oath?

10         A.   Yes.

11         Q.   The attorney for the IRS asked you --

12    there's the following exchange:

13              "Now, we looked at some financial

14    statements of Miller & Solomon during the course of

15    your testimony.  When we see an entry on those

16    financial statements, dividends, does that reflect

17    cash that's removed from the company?"

18              You answered:  "Yes.

19              "And who is that cash paid to?

20              "Answer:  The shareholders.

21              "That would be you and Mr. Kibler?

22              "Answer:  Yes.

23              "Okay.  When dividends are paid, what does

24    that do to net quick?

25              "Reduces it.

Page 66

1              "And what does that do to the bonding

2     capacity?

3              "Reduces it."

4              Did you see that?

5     A.   Yes.

6     Q.   Was that truthful testimony when you gave

7     it?

8     A.   Yes.

9     Q.   And you understood in 2011, 11 years after

10    your CARDS transaction, that you were paid dividends

11    in cash in 2000?

12    A.   Yes.

13    Q.   And you understood that the payment of

14    dividends in cash in 2000 reduced Miller & Solomon's

15    net quick?

16    A.   It appears so, yes.

17    Q.   And you remember that 11 years after your

18    CARDS transaction?

19    A.   Yes.

20    Q.   And 11 years after the time that the

21    dividend was issued?

22    A.   Yes.

23    Q.   Do you know when the cash dividend was

24    issued to you in 2000?

25    A.   No.

1    Q.   Was there -- did Miller & Solomon have a

2  practice of issuing cash and dividends to its

3  shareholders in a particular time of year?

4         MR. LINKOUS:  Object, vague and ambiguous.

5         You can answer.

6    A.   I don't remember.

7  BY MR. BROWNSTEIN:

8    Q.   Do you recall that in connection with your

9  CARDS transaction, you had to provide cash collateral

10 for the loan?

11   A.   Yes.

12   Q.   And do you remember the amount?

13   A.   No.

14   Q.   Do you recall that it was roughly $600,000?

15   A.   It may have been.

16   Q.   Does that sound about right to you?

17   A.   It may have been.  There were a lot of

18 numbers in this transaction.

19         May I move this?

20   Q.   You may, but you should set it aside.  We

21 will be going back to it a lot.

22         (Thereupon, marked as Exhibit 6.)

23 BY MR. BROWNSTEIN:

24   Q.   The court reporter has handed you what's

25 been marked as Exhibit 6.  My question is:  Do you

Page 83

```
 1        Q.   I think you mentioned representations by

 2   Brown & Wood to Mr. DeSiato.

 3             What representations are you referring to?

 4        A.   Their legal opinion.

 5        Q.   And the rep- -- you also mentioned

 6   representations by Chenery to DeSiato.

 7             What representations are you referring to?

 8        A.   I don't have the specifics at this time,

 9   but they were having conversations.

10        Q.   What conversations are you referring to?

11        A.   Any conversation that took place between

12   Mike DeSiato and Roy Hahn.

13        Q.   You -- I mean, how could you possibly know

14   what conversations took place between DeSiato and Roy

15   Hahn?

16        A.   I don't.

17        Q.   Okay.  When you first -- when Mr. DeSiato

18   first brought to your attention the CARDS

19   opportunity, what did he tell you about it?

20        A.   I don't have a clear recollection, sitting

21   here 17 years after, what he told me about it.

22        Q.   Do you have a general recollection?

23        A.   Yeah, that it was a loan agreement that

24   allowed us to put money in the company, and that it

25   worked for us financially.
```

Page 90

1    of yours?

2         A.   I don't remember.

3         Q.   Are you aware of the fact that you entered

4    into a tolling agreement with Mr. Braley and his law

5    firm in connection with CARDS?

6              MR. LINKOUS:  Objection, assumes facts not

7         in evidence.

8              You can answer.

9         A.   No.

10   BY MR. BROWNSTEIN:

11        Q.   Do you know what a tolling agreement is?

12        A.   I have a vague idea.

13        Q.   What is that idea?

14        A.   It stops something.

15        Q.   Do you recall how Mr. DeSiato first told

16   you about CARDS?  Was it an in-person meeting, over

17   the phone?

18        A.   I don't remember.

19        Q.   Did he explain to you at the time that you

20   had to have a business purpose before entering into a

21   tax-advantage transaction?

22             MR. LINKOUS:  Objection, vague and

23        ambiguous.

24             You can answer to the extent you understand

25        the question.

1   BY MR. BROWNSTEIN:

2       Q.   Do you understand my question?

3       A.   Yes.

4       Q.   Okay.

5       A.   I don't remember that he explained it to us

6   at that time.  I don't have a specific memory of that

7   meeting.

8       Q.   Did he explain it to you at any time prior

9   to your engaging in CARDS that you had to have a

10  business purpose before entering into CARDS?

11      A.   Yes.

12      Q.   Did you find it odd that you had to have a

13  business purpose for obtaining a loan?

14      A.   This seemed to be a -- a financial

15  instrument that was complicated, and the business

16  purpose was part of it, so I didn't think it was odd

17  because financial instruments can be very

18  complicated.  I mean, there -- there are attorneys

19  that deal with these things.

20      Q.   Did you understand that through CARDS you'd

21  be generating a $3.9 million loss?

22      A.   I had heard something about a loss.

23      Q.   And did you understand that in order to

24  justify the loss to the IRS, that you had to have a

25  business purpose?

Page 92

1      A.   What I understood is that we had to have a

2   legitimate business purpose to enter into this

3   agreement, and that without it, we shouldn't enter

4   into this agreement, but if we did, that the

5   agreement was sound.  What we were doing complied

6   with the law.

7      Q.   Well, you received a loan, correct?

8      A.   I believe so.

9      Q.   And so for -- for the loan side, business

10  purpose was neither here nor there, correct?

11          MR. LINKOUS:  Object to the form of the

12      question.

13          You can answer.

14      A.   I don't think you can dissect this

15  financial instrument that way, because it -- you have

16  to look at it as a whole, how did it work as a whole.

17  We were presented it as a whole.  We weren't

18  presented it as only a loan.  You know, a primary

19  purpose, it had a secondary with the tax savings.

20  BY MR. BROWNSTEIN:

21      Q.   Significant tax savings, correct?

22      A.   Relatively speaking, yes.

23      Q.   It's alleged in your complaint that at some

24  point in time you were looking for financing for M&S.

25          Does that generally comport with your

Page 94

1      Q.   Was one of them your father?

2      A.   Yes, I asked my father.

3      Q.   Was one of them United National Bank?

4      A.   It may have been.

5      Q.   Were you looking for a long-term loan?

6      A.   I don't remember, but it's the only type of

7   loan that would work.

8      Q.   Why do you say that?

9      A.   Because of net quick.

10      Q.   Do you understand the kind of loan -- did

11   you understand that CARDS was a short-term loan?

12           Let me strike that.

13           Do you understand that CARDS terminated at

14   the end of each year?

15      A.   It was renewable.

16      Q.   My question is:  You understood that it

17   terminated at the end of each year?

18      A.   Yes, but the way we looked at it, it was

19   renewable, so that it acted as if it was a long-term

20   loan.

21      Q.   That was your understanding?

22      A.   Yes, sir.

23      Q.   It terminated at the end of the year.  How

24   could it be renewed?  What was your understanding of

25   how it could be renewed?

Page 95

1        A.    I think the rate readjusted.  But as long

2    as the collateral was there, the loan was there.

3        Q.    You could decide not to continue the loan,

4    correct?

5        A.    I believe so.

6        Q.    And the bank could decide not to continue

7    the loan?

8        A.    I don't know.

9        Q.    Whatever the -- whatever the arrangement,

10   though, it would be set forth in the credit

11   agreement; is that fair to say?

12            MR. LINKOUS:  Object to form and

13        foundation.

14            You can answer.

15        A.    It may be.

16   BY MR. BROWNSTEIN:

17        Q.    But you do recall that it would have

18   terminated at the end of each year?

19        A.    I believe so.

20        Q.    Do you recall that you assigned the

21   proceeds to Miller & Solomon but not the obligations

22   of the loan?

23            MR. LINKOUS:  Object to the form of the

24        question.

25            You can answer if you understand the

Page 96

1       question.

2       A.   I believe that Larry and I -- I'm going say

3   yes to that.

4   BY MR. BROWNSTEIN:

5       Q.   When you were looking for forms of

6   financing, did you consider a short-term loan and

7   similarly assigning the proceeds but not the

8   obligation to repay in one year?

9       A.   We may have.

10       Q.   Do you have a specific recollection?

11       A.   No.

12       Q.   What amount of financing were you looking

13   for prior to entering into your CARDS transaction?

14       A.   I don't remember.

15       Q.   Did you -- in connection with finding other

16   forms of financing, did you offer to collateralize

17   the loan by its full amount in cash?

18           MR. LINKOUS:  Object to the form of the

19       question.

20           You can answer if you understand it.

21       A.   I don't remember.

22           (Thereupon, marked as Exhibit 8.)

23   BY MR. BROWNSTEIN:

24       Q.   The court reporter has handed you what's

25   been marked as Exhibit 8.  And it's a document

1      Q.   The subject matter of the email is:

2   "Tax-reduction strategy."  Do you understand -- did

3   you understand that CARDS was a tax-reduction

4   strategy?

5           MR. LINKOUS:  Objection, vague as to time.

6           You can answer.

7   BY MR. BROWNSTEIN:

8      Q.   In 2000?

9      A.   I don't know what I understood back then.

10  I really don't remember.  It was a complex

11  transaction that had a loan and a secondary tax

12  benefit.  And if you're going to characterize that,

13  or they do, as a tax-reduction strategy, then that's

14  what it is.

15     Q.   Just asking you for your understanding.

16     A.   I don't remember what I -- what I was

17  thinking 17 years ago.

18          (Thereupon, marked as Exhibit 11.)

19  BY MR. BROWNSTEIN:

20     Q.   The court reporter is handing you what's

21  been marked as Exhibit 11.

22     A.   Well, this is one year before the attack.

23     Q.   It appears so.

24          If you look at the -- it's an -- it's a

25  letter from Chenery to Mr. DeSiato.  And Chenery

1          THE WITNESS:  Just don't hit each other.

2          MR. BROWNSTEIN:  Definitely not.  He's a

3      hockey player.

4          THE WITNESS:  We've all been behaving very

5      nicely so far.

6  BY MR. BROWNSTEIN:

7      Q.   Did Mr. DeSiato recommend ways to mitigate

8  the risk that you might pay penalties in connection

9  with your CARDS transaction?

10     A.   Not that I recall, sitting here today.

11     Q.   Did you understand in 2000 that there was a

12 possibility that you might pay penalties in

13 connection with your CARDS transaction?

14     A.   I may have.

15     Q.    In 2000, did you understand that it was

16 possible that the IRS may not challenge your CARDS

17 transaction?

18     A.   Yes.

19     Q.   And did you also understand that they may

20 challenge your CARDS transaction -- understand back

21 in 2000 that they may challenge your CARDS

22 transaction?

23     A.   Yes.

24     Q.   And did you understand in 2000 that if they

25 challenged your CARDS transaction, you may have to

1   pay your -- you may have to pay the taxes?

2       A.   Yes.

3       Q.   And in 2000, did you understand that if the

4   risk of the IRS may challenge your charge -- CARDS

5   transaction, you pay -- have to pay back taxes plus

6   interest?

7       A.   Yes.

8       Q.   And this was -- was this explained to you

9   by your advisors?

10      A.   I think so.

11      Q.   Is it fair to say you were willing to

12  accept those risks when you participated in CARDS?

13          MR. LINKOUS:  Object to the form of the

14      question.

15          You can answer.

16      A.   Not if I knew the basis that the financial

17  transaction was being provided by HVB.  If I knew

18  that they knew -- if they had told me what they

19  really knew, which was that this transaction didn't

20  work, I would have never done it.  We wouldn't be

21  here today.  So that -- that's my response.

22  BY MR. BROWNSTEIN:

23      Q.   Not -- and I don't think that's responsive.

24  My question was simply:  Knowing those risks that we

25  discussed earlier, you were willing to accept them

1    and proceed with your CARDS transaction?

2              MR. LINKOUS:  Same objections.

3         A.   Based on -- yes, based on the

4    representations being true and accurate, the

5    representations by everyone in this transaction.  I

6    made a decision based on representations just like an

7    investment.

8    BY MR. BROWNSTEIN:

9         Q.   Mr. Kipnis, you made representations in

10   connection with the CARDS transaction; is that right?

11             MR. LINKOUS:  Object to the extent it calls

12        for a legal conclusion.

13             You can answer.

14        A.   I may have, based again on someone making

15   representations to me.

16        Q.   We'll look at those -- your representations

17   a little bit later today.

18        A.   I don't doubt that we -- that we will.

19        Q.   When you said, had you known what they

20   really knew, and I think you were talking what HVB

21   knew, again, it would be speculation for you to

22   testify as to what HVB knew; is that right?

23        A.   Not based on the deferred prosecution

24   agreement, that's a piece of evidence.

25        Q.   So -- so -- so your assertion about what

Page 118

1              "Yes."

2              Is that testimony true and accurate at the

3     time you gave it?

4        A.    Yes.

5        Q.    Turn to 166, please, line 13.

6              "How did you find Mr. Braley?

7              "Through Mr. DeSiato."

8              Do you see that?

9        A.    Yes.

10       Q.    Is that testimony true?

11       A.    Yes.

12             (Thereupon, marked as Exhibit 15.)

13    BY MR BROWNSTEIN:

14       Q.    The court reporter has handed you what's

15    been marked as Exhibit 15.  It's an email from Ron

16    Braley to you, Mr. Kibler, Mr. DeSiato, Subject:

17    "Engagement letter, Miller & Solomon."

18             Do you see that?

19       A.    Yes.

20       Q.    Do you recall receiving this -- and

21    attached to this email is, in fact, an engagement

22    letter with your signature; is that correct?

23       A.    It is stapled to it, and it does have my

24    signature.

25       Q.    Did you read this engagement letter before

Page 119

1    you signed it?

2         A.    I would think so.

3         Q.    And if you see on the first line of the

4    letter, Mr. Braley writes to you:  "This letter is in

5    follow-up to our conversation on August 19th."

6              Do you see that?

7         A.    Yes.

8         Q.    And we saw early -- in an earlier exhibit

9    there was a reference to a phone conversation between

10   you and Braley on August -- October 19th; is that

11   right?

12        A.    Yes.

13        Q.    And if you look the next paragraph he says:

14   "We discussed arranging for a card credit facility

15   for you in the neighborhood of euros 7,100,000 (the

16   dollar equivalent being around 5,882,000)."

17             Do you see that?

18        A.    Yes.

19        Q.    Fair to say that was discussed on your

20   phone conversation with Mr. Braley on October 19th,

21   2000?

22        A.    It's what he says.

23        Q.    Do you have any reason to believe that you

24   did not discuss the size of your credit facility on

25   the October 19th phone conversation with Mr. Braley?

Page 121

1           Do you see that?

2      A.   Yeah.

3      Q.   Second paragraph up from the bottom on the

4  second page of the letter.

5      A.   It starts with "at" -- "at the

6  anniversary"?

7      Q.   Correct.  The second begins:  "In the event

8  of a dispute with the IRS."

9      A.   Yes.

10     Q.   Fair to say that you were advised that

11  there was a risk that the IRS would dispute your

12  CARDS transaction in or about October 20, 2000?

13          MR. LINKOUS:  Object to the form of the

14      question.

15          You can answer.

16     A.   I don't see that here.  I just see he's

17  offering support liti- -- IRS support litigation

18  services.  Maybe somewhere else in there -- here he

19  advises us.

20  BY MR BROWNSTEIN:

21     Q.   You don't believe that when he -- when he

22  write -- wrote to you in his engagement letter:  "In

23  the event of a dispute with the IRS" that he

24  wasn't -- that he wasn't advising you that there was

25  a risk that the IRS might dispute your CARDS

Page 122

1    transaction?

2              MR. LINKOUS:  Same objections.

3         A.   It could be interpreted that way.

4    BY MR BROWNSTEIN:

5         Q.   Do you interpret it that way?

6              MR. LINKOUS:  Objection, vague as to time.

7              You can answer.

8         A.   I don't know what I thought then.

9    BY MR BROWNSTEIN:

10        Q.   If you turn to the third page of the

11   letter, third line down from the top, he writes:

12   "Business purpose always seems to be a critical piece

13   to the analysis.  And I believe that your business

14   purpose is a good one.  I will need to see your

15   business plan and" --

16        A.   Where -- where are we now?  Which

17   paragraph?  We are in this --

18        Q.   The third line from the top.

19        A.   Oh, okay, yes, I see.

20        Q.   "Business purpose always seems to be a

21   critical piece to the analysis."

22              Fair to say that Braley advised you in or

23   about October 20, 2000, that business purpose was a

24   critical piece to the analysis of whether the IRS

25   would allow your CARDS deduction?

Page 123

```
 1              MR. LINKOUS:  Object to the form.

 2              You can answer.

 3        A.   Well, he said it always seems,

 4    quote-unquote.  That's fair to say.

 5    BY MR BROWNSTEIN:

 6        Q.   You understood at the time that business

 7    purpose was a critical piece to the -- the analysis

 8    the IRS would use to determine whether to allow your

 9    CARDS deduction?

10        A.   I would say yes.

11        Q.   In the next -- first sentence of the next

12    paragraph he writes:  "While your free cash from this

13    transaction is now only a guess."

14              Fair to say you had no idea as of

15    October 20 the amount of the net loan proceeds you

16    would receive -- M&S would receive as a result of

17    your CARDS transaction?

18              MR. LINKOUS:  Object to the form of the

19         question.

20              You can answer.

21        A.   I don't remember.

22    BY MR BROWNSTEIN:

23        Q.   Fair to say that's what he's advising you

24    of as of October 20, 2000?

25              MR. LINKOUS:  Same objections.
```

Page 124

1      A.   That's what he said.

2   BY MR BROWNSTEIN:

3      Q.   And in the next paragraph, he writes in the

4   middle, six lines down:  "You have projected your tax

5   liability apart from this transaction at about

6   $1.75 million."

7           Do you see that?

8      A.   Yes.

9      Q.   Fair to say that as of October 20, 2000,

10  you had projected your tax liability at about

11  $1.75 million?

12     A.   That's what this says.

13     Q.   And then you -- and you communicated that

14  projection to Mr. Braley?

15     A.   Either Larry or I did, since we both signed

16  this.  I don't remember what happened here.  I don't

17  recall 17 years ago the conversations that you're

18  asking me about.  I can only rely on this letter.

19     Q.   And you have no reason to dispute the

20  accuracy of this letter?

21     A.   Not sitting here at this time.

22     Q.   If you look at the first sentence of that

23  paragraph, the paragraph says:  "Of course you

24  theoretically could have accomplished a better result

25  with a direct investment of the $1 million in your

Page 126

1              That's a conclusion that he would reach as

2       whatever expertise he has.

3              So he's talking in theory.  And theory is,

4       you know, it may or it may not have credibility.

5       It's theoretical.

6          Q.   Did you --

7          A.   So I don't -- I don't know what this means.

8          Q.   Do you believe that Mr. Braley was not

9       being truthful to you in his advice?

10         A.   Are you asking for my state of mind back in

11      the year 2000?

12         Q.   Let's start there.

13         A.   I don't know.

14         Q.   How about now?

15         A.   I don't remember.

16         Q.   How about now?

17         A.   He may not have been.

18         Q.   You don't know one way or the other?

19         A.   I don't know.

20         Q.   Do you -- I think you already -- we had

21      looked at testimony from the tax court trial where we

22      already went over this that isn't it true -- just a

23      true statement that if you had invested directly, the

24      $600,000 or so of cash collateral, into

25      Miller & Solomon, it would have increased its net

Page 127

```
 1    quick by a greater amount than the CARDS loan

 2    proceeds?

 3             THE WITNESS:  Could you please repeat that?

 4             THE COURT REPORTER:  Yes.

 5             (Requested portion read back.)

 6        Q.   I'd like to modify that.  It was

 7    transcribed as 60,000, I meant to say 600,000.

 8        A.   I think you did, and it got transcribed as

 9    60.

10        Q.   Thank you.

11        A.   I'll say yes.

12        Q.   If you look at the last line of that page,

13    page 3, Mr. Braley is advising you:  "If you could

14    sustain this pace, at the end of four years, you have

15    accumulated, after tax, nearly $15 million.  If this

16    transaction were disputed by the IRS and you choose

17    not to fight, or you otherwise paid all the tax in

18    four years with no penalties, you would owe about

19    $2.5 million."

20             Do you -- do you see that?

21        A.   Yes, I do.

22        Q.   Is it fair to say that as of October 20,

23    2000, Mr. Braley was saying, essentially, that the

24    worst-case scenario for you if you participate in

25    CARDS is that you spend $2.5 million to make
```

Page 138

1    second-to-last paragraph that begins:  "I've had no

2    problems."

3         A.   Okay.

4         Q.   It says:  "I have had no problems with

5    Chenery over money in the past."

6              Do you see that?

7         A.   Yes.

8         Q.   And then he goes on to say:  "Neither

9    Chenery nor Roy have any history of financial

10   problems."

11             Do you see that?

12        A.   Yes.

13        Q.   Did you understand, in or about

14   October 25th, 2000, that Mr. Braley had a pre --

15   prior relationship with Roy Hahn of Chenery?

16        A.   He's saying he does.

17        Q.   And you understood that at the time?

18        A.   I must have.

19        Q.   The court reporter has handed you what's

20   been marked as Exhibit 16.

21             THE COURT REPORTER:  17.

22             MR BROWNSTEIN:  17.

23             THE WITNESS:  It looks like 17.  I cross my

24   7s.

25             (Thereupon, marked as Exhibit 17.)

Page 139

1    BY MR BROWNSTEIN:

2         Q.   Do you recognize this -- feel free to

3    review it.  My question is only:  Do you recognize

4    this document?

5         A.   I see what it says.  I don't remember it

6    from 17 years ago, but I see what it says.

7         Q.   Is this your engagement agreement with

8    Chenery?

9         A.   It says this set forth the term of the

10   engagement.  So yes it would be, yep.

11        Q.   In the second paragraph, second sentence,

12   it says:  "Chenery has described to you the terms and

13   conditions of the credit facility that is summarized

14   on the attached term sheet."

15             Do you see that?

16        A.   Let's see, this is -- 30-year maturity,

17   Chenery has arranged --

18             MR. LINKOUS:  Again, don't read out loud.

19        She has to take it down.

20        A.   Sorry.  Where am I looking?

21   BY MR BROWNSTEIN:

22        Q.   The second paragraph.  The second sentence.

23        A.   Okay.  I see it.

24        Q.   "Chenery has described to you the terms and

25   conditions of the credits facility."

Page 140

1          Do you see that?

2     A.   Yes.

3     Q.   As of October 30th, 2000, had Chenery

4  described to you the terms and conditions in the

5  credit facility?

6     A.   I don't remember.

7     Q.   Do you remember having any conversations

8  with Roy Hahn in connection with your CARDS

9  transaction?

10    A.   No.

11         (Thereupon, marked as Exhibit 18.)

12  BY MR BROWNSTEIN:

13    Q.   The court reporter has handed you what's

14  been marked as Exhibit 18.

15         Do you recognize this to be the term sheet

16  of your transaction of your transaction -- of your

17  CARDS transaction as presented by Chenery?

18    A.   No.

19    Q.   I'm sorry.  What was the answer?

20    A.   No.

21    Q.   You don't recognize that -- that to be the

22  case?

23    A.   No, it -- it -- it looks like a term sheet,

24  and it looks like that transaction, but do I

25  recognize it as that, no.  It -- it could very well

Page 142

1    BY MR BROWNSTEIN:

2        Q.    Do you have any reason to believe that this

3    is not the term sheet for your engagement with

4    Chenery?

5        A.    Not sitting here at this time.

6        Q.    If you could look at term sheet, please.

7              Chenery is described as the arranger.  Do

8    you see that?

9        A.    Not yet.

10       Q.    It's the second line.

11       A.    Oh, yes.

12       Q.    And at the bottom you see there's a tax

13   opinion from Brown & Wood.  Do you see that?

14       A.    Yes.

15       Q.    Fair to say that -- and the lender -- there

16   was going to be a lender as part of the term sheet,

17   right?  And at the time it was not yet determined who

18   your lender would be; is that correct?

19       A.    It says:  "To be determined."

20       Q.    Right.  Fair to say that Chenery is

21   presenting you the term sheet of a CARDS transaction

22   that would involve Chenery, a tax opinion from

23   Brown & Wood, and a bank that was to be determined?

24       A.    Yes.

25       Q.    And that these entities would be working

Page 143

1    together to help facilitate your CARDS transaction?

2    You understood that, correct?

3              MR. LINKOUS:  Object to the form of the

4         question.

5              You can answer if you understand it.

6         A.   I don't remember what I understood then,

7    but that's what it looks like from this paper.

8    BY MR BROWNSTEIN:

9         Q.   You understood that Chenery was involved in

10   your CARDS transaction, right?

11        A.   Yes.

12        Q.   And you understood that Brown & Woods --

13   Wood was involved, right?

14        A.   Yes.

15        Q.   And you understood that HVB was involved?

16        A.   Yes.

17        Q.   And you understood that all three of these

18   entities were working together to facilitate your

19   CARDS transaction?

20        A.   Yes.

21              MR. LINKOUS:  Object to the form.

22              THE WITNESS:  Sorry.

23              (Thereupon, marked as Exhibit 19.)

24   BY MR BROWNSTEIN:

25        Q.   The court reporter has handed you what's

Page 155

1    BY MR BROWNSTEIN:

2        Q.    The court reporter has handed you what's

3    been marked as Exhibit 23.

4              It's a letter from Bayerische Hypo-Und

5    Vereinsbank dated December 21, 2000 to you and

6    Mr. Kibler.

7              My first question is:  Is that your

8    signature on the second page?

9        A.    Yes.

10       Q.    And did you read this letter before signing

11   it?

12       A.    I would think so.

13       Q.    Was it your practice to review documents

14   before signing them?

15       A.    I would read them, yes.

16       Q.    Now, HVB is writing to you in the second

17   paragraph:  "In consideration for our consent to the

18   assumption of the loan, you hereby represent,

19   warrant, and acknowledge to us."

20             And then there's four bullets.  Do you

21   see?

22       A.    Yes.

23       Q.    And the first one is:  "HVB had no

24   involvement and it accepts no responsibility for the

25   establishment, promotion, or marketing of the

1      Q.   And you understand that there was a series

2  of agreements that made up your CARDS transaction,

3  correct?

4      A.   A series of agreements.  Well, it was a

5  loan.  I don't know what the agreements are.

6      Q.   Did you understand just generally that

7  there were agreements that were a part of your CARDS

8  transaction?

9      A.   I don't know, sitting here today, what

10  agreements or documents actually composed the CARDS

11  transaction.

12      Q.   Okay.  I understand.  And we'll show you --

13  I'll show you those.

14      A.   I'm sure you will.

15      Q.   It's just a more general question.  You

16  understood that there were agreements that were part

17  of your CARDS transaction?

18      A.   Yes.

19      Q.   Okay.  Did you -- did you read those

20  documents?

21      A.   Yes.

22      Q.   And did you under- -- generally understand

23  the term of the loan?

24          MR. LINKOUS:  Objection, vague and

25          ambiguous.

Page 162

1          You can answer to the extent you understand

2      the question.

3  BY MR BROWNSTEIN:

4      Q.   I'm going to modify the question.

5           Did you generally understand the terms of

6  the loan?

7           MR. LINKOUS:  Same objections.

8      A.   Some of them.

9  BY MR BROWNSTEIN:

10     Q.   Can you please look at page 167.

11          Are you there?

12     A.   How convenient.  It was open to that page.

13     Q.   Okay.

14     A.   Good work.

15     Q.   Line 23:  "Did you understand the terms of

16  this loan?"

17          Your answer:  "Generally speaking, yes."

18          Is that true?

19     A.   There you have it.

20     Q.   Is that true?

21     A.   Apparently so.  I didn't lie at my trial.

22     Q.   Okay.  So the answer is yes, it was true?

23     A.   Yes.

24     Q.   That's true.

25          (Thereupon, marked as Exhibit 24.)

Page 167

1    banks, and HVB Structured Finance Inc., and it's

2    dated as of December 5, 2000.

3            Mr. Kipnis, do you recognize this to be

4    the credit agreement that's part of your CARDS

5    transaction?

6        A.   I don't recognize it, but it says it is.

7    So I'm not here to dispute it.

8        Q.   If you could turn to what's page 22,

9    Section 517.

10       A.   Okay.  Hold on.

11           Page 22, Section 517, "No reliance"?

12       Q.   Correct.

13           And early in the previous exhibit in the

14    assumption agreement, we saw that you had agreed to

15    assume the representations and warranties that are

16    in the credit agreement.

17           Do you recall that?

18       A.   Yes.

19       Q.   All right.  And it says here 1517(a):  "The

20    borrower is not relying upon any advice, counsel, or

21    representations of the agent or any bank."

22           Do you see that?

23       A.   Yes, I do.

24       Q.   And were you, at the time, relying on any

25    advice, counsel, or representations of the bank?

Page 168

```
 1              MR. LINKOUS:  Object to the extent it calls

 2       for a legal conclusion.

 3              You can answer.

 4       A.   I agreed in writing that I'm not, but I

 5  also didn't know that it was a criminal fraud what

 6  they were doing.

 7  BY MR. BROWNSTEIN:

 8       Q.   And, again, the criminal fraud that you

 9  refer to is what's stated in the DPA?

10       A.   Yeah, they -- they had an obligation to

11  tell me that none of -- this was all voodoo, it was

12  make-believe.  They had an obligation, and they

13  did -- they did this whole thing to take my money,

14  and then put in things like this so that you could

15  now ask me about them.

16       Q.   My question was:  Did you rely on any

17  advice, counsel, or representation of HVB?

18              MR. LINKOUS:  Object to the extent it calls

19       for a legal conclusion.

20              You can answer.

21       A.   Not sitting here, I -- I don't recall at

22  this time, sitting here.

23  BY MR. BROWNSTEIN:

24       Q.   And you said -- by the way, when you said

25  "voodoo" and the like in your previous response,
```

Page 169

1    again, you're referring to statements that were in

2    the DPA that you believe weren't disclosed to you; is

3    that right?

4         A.    Correct.

5         Q.    Okay.

6         A.    Had the statements in the DPA been

7    disclosed to us, we would have never entered into

8    this transaction.

9         Q.    If you look at 1517(b).

10        A.    1517?

11        Q.    I'm sorry, 517(b).

12        A.    What page would you --

13        Q.    Page 22.

14        A.    Okay.  517(b).  It starts with "The

15   borrower has consulted"?

16        Q.    That's correct.

17        A.    Got it.

18        Q.    Remember, in the assumption agreement, your

19   documents.  So now this is you.

20        A.    Right.

21        Q.    Okay.  "You have consulted with your own

22   legal, regulatory, tax, business, investment,

23   financial, and accounting advisors to the extent it

24   is deemed necessary."

25              Did you, in fact, do that?  Did you, in

Page 174

1           MR. LINKOUS:  Objection to the extent it

2      calls for a legal conclusion.

3           You can answer.

4      A.   It didn't says I didn't.

5  BY MR. BROWNSTEIN:

6      Q.   I know that's what it says.  I'm asking you

7  if you believed HVB was acting as fiduciary in

8  connection with the provision of a loan to you?

9           MR. LINKOUS:  Same objections.

10     A.   I signed this.  I had to agree with it.

11  BY MR. BROWNSTEIN:

12     Q.   My question is slightly different.  Did you

13  believe in 2000 that HVB was your fiduciary or

14  investment advisor when they provided you a loan?

15          MR. LINKOUS:  Same objections.

16     A.   I don't know.

17  BY MR. BROWNSTEIN:

18     Q.   Okay.  Is it fair to say that HVB did not

19  give you any advice, counsel, assurance, guarantee,

20  or representation whatsoever as to the expected or

21  projected success, profitability, return, tax

22  treatment, savings, performance, result, effect,

23  consequence, benefits or merits either legal,

24  regulatory, tax, business, investment, financial,

25  accounting or otherwise in connection with your CARDS

Page 175

1    transaction?

2         A.    I don't remember.

3               Sitting here right now, I just, I don't

4    remember.

5         Q.    Okay.  Did you go over this document with

6    Mr. Braley or Mr. DeSiato?

7         A.    I don't remember.  Again, 17 years ago.

8               MR BROWNSTEIN:  Did you want to take a

9         break?

10              MR. LINKOUS:  Please.

11              THE VIDEOGRAPHER:  Off the record.  The

12        time is 1:54 p.m.

13      (Recess was held from 1:54 p.m. until 2:03 p.m.)

14              THE VIDEOGRAPHER:  We're back on the

15        record.  The time is 2:03 p.m.

16              (Thereupon, marked as Exhibit 26.)

17   BY MR. BROWNSTEIN:

18        Q.    The court reporter has handed you what is

19   marked as Exhibit 26.

20              Did you sign this agreement?  I will refer

21   you to the Bates number that ends in 1550.

22        A.    I certainly signed that page.

23        Q.    Do you understand this document to be the

24   assuming party master pledge and security agreement

25   in connection with your CARDS transaction?

Page 184

1    right, it was your understanding that the loan

2    terminated at the first year?

3        A.    And I could renew it.

4        Q.    And you could renew it.  But it only

5    renewed if both parties agreed to renew, fair to say?

6        A.    I'm not sure about that, but I already

7    assigned the proceeds to Miller & Solomon, so the

8    loan renewing was between me personally, I think.

9    And the proceeds already went to Miller & Solomon.

10   They didn't get -- they were not subject to renewal.

11       Q.    So Miller & Solomon was agnostic to the

12   term of the loan --

13            MR. LINKOUS:  Object --

14   BY MR BROWNSTEIN:

15       Q.    -- is that fair to stay?

16            MR. LINKOUS:  Object to the form of the

17       question.

18       A.    If that means not believing in God -- I'm

19   not sure what "agnostic" means.  Can you use a

20   different word, please.

21   BY MR. BROWNSTEIN:

22       Q.    It was immaterial to Miller & Solomon.

23            MR. LINKOUS:  Same objection.

24   BY MR. BROWNSTEIN:

25       Q.    The term of the loan is immaterial because

1    it wasn't part- -- party of the loan, correct?

2         A.    I think so, I think that's correct.

3         Q.    And reading on, it says:  "The lending

4    institution that is committed to the loan is

5    HypoVereinsbank New York, New York, and the

6    collateral for the loan will be held by their agent,

7    HVB Structured Finance, Inc. which will be equal in

8    value to the entire face amount of the loan.

9              Fair to say that Mr. Braley is advising

10   you in December 26th, 2000 that the collat- -- that

11   the entire amount of the loan is going to be fully

12   collateralized by its own proceeds?

13             MR. LINKOUS:  Object to the form of the

14        question.

15             You can answer if you understand it.

16        A.    Yes.

17   BY MR. BROWNSTEIN:

18        Q.    And he's advising you, also, that the

19   counter-party of the loan is Wimbledon Financial

20   Trading, LLC, correct?

21        A.    Yes.

22        Q.    And that was the counter-party to the

23   credit agreement we saw earlier, right?

24        A.    Uh-huh, yes.

25        Q.    And it was also one of the parties to the

1    should have a tax deduction for the loss?

2         A.   I don't know if he's advising us or

3    explaining to us the Brown & Wood.  I'm -- I'm not

4    quite sure.

5         Q.   Fair enough.  Either way, it's -- he's

6    explaining.

7         A.   He's talking about it.

8         Q.   Right.

9              So the citizenship of the members of

10   Wimbledon were discussed twice in this letter,

11   right?

12        A.   Yes.

13        Q.   Do you have any -- were you aware of any

14   other reason that the members of the LLC were British

15   citizens?

16             MR. LINKOUS:  Object to the form of the

17        question.

18             You can answer if you understand.

19        A.   No.

20   BY MR. BROWNSTEIN:

21        Q.   Did you know who the members of the LLC

22   were?

23        A.   No.

24        Q.   Did you negotiate -- fair to say, then, you

25   did not negotiate with them over any of the terms of

Page 194

1    your CARDS transaction?

2         A.   Correct.

3         Q.   Are you aware of either DeSiato or Braley

4    negotiating the terms of your credit agreement with

5    the members of Wimbledon?

6         A.   No.  I -- I do -- I do remember something

7    about the rate going down.

8         Q.   And what rate are you referring to?

9         A.   And it may be in just these documents I've

10   read, in one of the emails that we read today that it

11   went down from 2350 to 180 or 150 LIBOR.

12        Q.   What rate are you referring to?

13        A.   Of the loan.

14        Q.   The rate of the loan?

15        A.   Yeah.

16        Q.   Did you understand that your cash

17   collateral -- collateral would be accruing interest?

18             MR. LINKOUS:  Objection, vague as to time.

19             You can answer.

20        A.   Yes.

21   BY MR. BROWNSTEIN:

22        Q.   Did you understand, before you entered your

23   transaction, that the cost of the loan would be

24   greater than the interest that you earned on your

25   cash collateral?

Page 209

1      A.   No.

2           (Thereupon, marked as Exhibit 32.)

3   BY MR. BROWNSTEIN:

4      Q.   The court reporter has handed you what's

5   been marked as Exhibit 32.

6           Do you understand this to be a mutual

7   release agreement with you, Mr. Kibler on one hand

8   and CBIZ on the other?

9      A.   It appears to be, yes.

10     Q.   And you signed this agreement, correct?

11     A.   Yes.

12     Q.   And you understand that CBIZ paid you and

13  Mr. Kibler $300,000 in connection with mutual

14  release?

15     A.   Where's the money part?

16     Q.   Well, I guess my question is independent of

17  the document.

18     A.   I don't remember how much it was.

19     Q.   Section 2.

20     A.   That's what it says, yes.

21     Q.   And if you see that attached to the release

22  is an affidavit for Mr. DeSiato.

23          Do you see that?

24     A.   Yes.

25     Q.   Was -- was Mr. DeSiato's provision of this

Page 219

1   that amount of money to Miller & Solomon in 2001 to

2   increase its net quick?

3        A.   No.

4             (Thereupon, marked as Exhibit 35.)

5   BY MR. BROWNSTEIN:

6        Q.   The court reporter has handed you what's

7   been marked as Exhibit 35.

8             It's an email from Ron Braley dated

9   October 15th, 2001, to you and Mr. Kibler copying

10  Mike DeSiato, and May Kwan.  Subject:  "CARDS note

11  reset."

12            Do you see that?

13       A.   Yes.

14       Q.   Do you recall who May Kwan is?  Maybe we

15  already talked about this.

16       A.   We did.

17            I can't tell you specifically who she works

18       for.

19  BY MR BROWNSTEIN:

20       Q.   Okay.

21       A.   Or her -- or her role.

22       Q.   Mr. Braley tells you that your CARDS note

23  will be up for renewal in December.

24            Do you see that?

25       A.   Yes.

Page 220

1      Q.   Do you recall that you requested that, to

2  terminate the CARDS loan?

3      A.   Yes.

4      Q.   And did you, in fact, did make that

5  request?

6      A.   I believe so.

7      Q.   Is it fair to say you did not desire to

8  renew it for a second year?

9           MR. LINKOUS:  Objection, vague as to time.

10           You can answer.

11      A.   Yes.

12  BY MR. BROWNSTEIN:

13      Q.   In 2001?

14           MR. LINKOUS:  Same objections.

15  BY MR BROWNSTEIN:

16      Q.   He writes a question to you:  "Is

17  sheltering income still an issue?"

18           Was sheltering income also an issue for

19  you in 2001?

20           MR. LINKOUS:  Object to the form of the

21      question.

22           You can answer.

23      A.   I'm going to say apparently not, because we

24  terminated the loan.

25

Page 221

1    BY MR. BROWNSTEIN:

2        Q.   And you knew that the loan was a way to

3    shelter your income?

4            MR. LINKOUS:  Object to form.

5        A.   No, but we knew that there was a deduction.

6    He used the term "sheltering income," not -- not me.

7    BY MR. BROWNSTEIN:

8        Q.   When your CARDS loan terminated, did you

9    expect an audit from the IRS in connection with your

10   2000 and 2001 tax return because of your CARDS

11   transaction?

12       A.   No.

13           THE WITNESS:  Sorry.

14           MR. LINKOUS:  That's fine.

15           THE WITNESS:  I paused.

16   BY MR. BROWNSTEIN:

17       Q.   Did you do anything in 2001 and 2002 in

18   preparation for a potential audit by the IRS?

19       A.   I don't believe we prepared for an audit.

20       Q.   Did you prepare for a challenge by the IRS

21   in connection with your CARDS transaction?

22           MR. LINKOUS:  Objection, vague as to time.

23       A.   I don't believe so.

24   BY MR. BROWNSTEIN:

25       Q.   Isn't it true that you transferred your

Page 222

1    ownership interest in Miller & Solomon, after your

2    CARDS transaction closed, to a trust?

3          A.   If that's what the record shows.

4               (Thereupon, marked as Exhibit 36.)

5    BY MR. BROWNSTEIN:

6          Q.   The court reporter has handed you what's

7    been marked as Exhibit 36.  It's entitled:  "DJK

8    Irrevocable Trust."

9               Do you recognize this document?

10         A.   No.

11         Q.   Do you see that you are the grantor?

12         A.   Yes.

13         Q.   And it's dated December 20, 2002?

14         A.   Yes.

15         Q.   Do you understand that this -- you granted

16   to the trust your interest in Miller & Solomon?

17              MR. LINKOUS:  Object to foundation.

18              You can answer.

19         A.   Would you just help me and show me where I

20   did that and I can agree to it.  Does that say on

21   page 1?

22   BY MR. BROWNSTEIN:

23         Q.   Correct.

24         A.   Yes.

25         Q.   Did you do this -- did you transfer your

Page 223

1    ownership interest in Miller & Solomon to a trust so

2    that in the event that the IRS went after you for

3    failing to pay taxes, they would not be able to touch

4    the assets of Miller & Solomon?

5              MR. LINKOUS:  Object to the form.

6              You can answer.

7         A.   I don't remember when I did it, but -- why

8    I did it, but maybe Mr. Wells knows.  But I don't

9    remember.

10             (Thereupon, marked as Exhibit 37.)

11   BY MR. BROWNSTEIN:

12        Q.   The court reporter has handed you what's

13   been marked as Exhibit 36.

14             Do you recognize this document,

15   Mr. Kipnis?

16        A.   I see what it says.

17        Q.   And on the back page, is that your

18   signature?

19        A.   Yes, it is.

20        Q.   Fair to say that you entered into a

21   settlement agreement and release with Sidley in

22   connection with your CARDS transaction?

23        A.   It appears so.

24        Q.   And this is dated -- this agreement is

25   dated September 26th, 2011, correct?

Page 224

1        A.    Yes.

2        Q.    And Sidley paid you and Mr. Kibler $250,000

3    in connection with this settlement agreement and

4    release, correct?

5              I can refer you to page 2 of 8 --

6        A.    Okay, I see it --

7        Q.    -- Section 2.

8        A.    -- down at the bottom, yes.

9        Q.    So earlier we saw that you settled with

10   CBIZ for $300,000, and you settled with Sidley for

11   $250,000.  So you've already received $550,000 in

12   settlements, correct?

13       A.    Correct.

14       Q.    And that's more than the -- the fees that

15   you paid to enter into CARDS, right?

16       A.    Yes, and we've been now paying litigation

17   fees for years.

18       Q.    And you're still pursuing those CARDS fees

19   from HVB not withstanding that you recovered more

20   than the fee amount from these other parties?

21       A.    Yes.

22             MR. LINKOUS:  Objection to the extent it

23        calls for a legal conclusion.

24             THE WITNESS:  Sorry.

25             MR. BROWNSTEIN:  Why don't we take a break?

Page 228

```
 1       A.    Yes.

 2       Q.    Okay.

 3             (Thereupon, marked as Exhibit 38.)

 4  BY MR. BROWNSTEIN:

 5       Q.    The court reporter has handed you what's

 6  been marked as Exhibit 38.

 7             My first question is:  Is this the

 8  settlement agreement and release in connection with

 9  your bankruptcy?

10       A.    It appears to be.

11       Q.    Am I correct that in connection with the

12  settlement, you agreed to pay the IRS $950,000?

13             Do you recall, without the document?

14       A.    I forget the exact amount I paid the IRS.

15       Q.    Okay.  It's page 6.

16       A.    Thank you.

17       Q.    At the top.

18       A.    That's what it says.

19       Q.    And where did you get the funds to pay for

20  that amount?

21       A.    I took a distribution from Development

22  Service Solutions.

23       Q.    The company or the trust?

24       A.    I don't recall.

25       Q.    And who did -- who decided to allow DSS to
```

Page 230

1          A.    There's another $200,000 of payments for

2    administrative fees and costs.  I had to give up an

3    asset, which is the profits interest --

4          Q.    We'll get to --

5          A.    -- to settle the --

6                MR. LINKOUS:  Are you finished answering,

7          Mr. Kipnis?

8                THE WITNESS:  I stopped.

9    BY MR BROWNSTEIN:

10         Q.    I just want to break it down.  The

11   $200,000, that was paid to the estate, correct?

12               Let me ask a different question.

13               Have you paid any other amount to the IRS

14   in settling your tax liability?

15               MR. LINKOUS:  Object to the form.

16               You can answer.

17   BY MR. BROWNSTEIN:

18         Q.    Other -- other than the $950,000?

19               MR. LINKOUS:  Same objections.

20         A.    I gave an asset.

21   BY MR. BROWNSTEIN:

22         Q.    Okay.  Do you -- and that was the profit

23   interests in two properties; is that correct?

24         A.    Yes.

25         Q.    To your knowledge, have those assets paid

Page 231

1    profits to the IRS?

2         A.   No.

3         Q.   Can we go back to Exhibit 20, which is your

4    amended complaint in this action.

5              And I would like you to turn to -- if you

6    look in the upper right-hand corner, it's page 83 of

7    85.

8              And just so you understand, this is from

9    the statement of admitted facts that HVB entered

10   into in connection with its deferred prosecution

11   agreement.  This was all attached to your complaint.

12             And in paragraph 18, it says:  "HVB

13   participated with various entities, professionals,

14   and clients in other tax-shelter transactions

15   besides BLIPS that involved similarly fraudulent and

16   illegal elements."

17             Do you see that?

18        A.   Yes.

19        Q.   It goes on to say -- it says:  "For

20   example, under DeGiorgio's supervision, HVB

21   participated in a series of transactions known as

22   CARDS."

23             Do you see that?

24        A.   Yes.

25        Q.   And it goes on to describe the fraudulent

1      A.    I believed that DeSiato negotiated on our

2    behalf.

3    BY MR. BROWNSTEIN:

4      Q.    Do you know what terms he negotiated on

5    your behalf?

6      A.    No.

7      Q.    Isn't it true that you understood that this

8    was brought to you as a packaged deal?

9            MR. LINKOUS:  Object to the form.

10           You can answer.

11     A.    I don't recollect that.

12   BY MR. BROWNSTEIN:

13     Q.    You understood that there would be a loan

14   to an LLC, correct?

15           MR. LINKOUS:  Objection, vague as to time.

16           You can answer.

17     A.    I knew there was going to be a loan.  I

18   didn't know it's to an LLC.

19   BY MR. BROWNSTEIN:

20     Q.    Well, we looked at a number of agreements,

21   there was an assumption agreement.  You knew that

22   there was -- you were going to assume something,

23   correct?

24     A.    Yes.

25     Q.    And did you think that there was going to

1    be any other way to -- to get your loan?

2              MR. LINKOUS:  Object to the form.

3         A.   I don't know.  This was all very

4    complicated to me.

5    BY MR. BROWNSTEIN:

6         Q.   You didn't negotiate the assumption

7    agreement, correct?

8         A.   I don't remember one way or another.

9         Q.   You didn't negotiate the deposit agreement,

10   did you?

11        A.   I don't remember one way or another.

12        Q.   You didn't negotiate the master pledge and

13   security agreement, did you?

14        A.   I don't remember.

15        Q.   And did you negotiate the assignment -- and

16   you didn't negotiate the assignment agreement, did

17   you?

18        A.   I don't remember.

19        Q.   In fact, you're unaware of any negotiation

20   going on with your CARDS transaction; is that

21   correct?

22             MR. LINKOUS:  Objection, misstates

23        testimony.

24             You can answer.

25        A.   I don't remember.